281 N.W.2d 201 (1979)
203 Neb. 832
METROPOLITAN TECHNICAL COMMUNITY COLLEGE EDUCATION ASSOCIATION, Appellee,
v.
METROPOLITAN TECHNICAL COMMUNITY COLLEGE AREA, a Political Subdivision, Appellant.
No. 42009.
Supreme Court of Nebraska.
July 3, 1979.
*202 Joseph J. Barmettler and Robert T. Cannella, of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, Omaha, for appellant.
Theodore L. Kessner of Crosby, Guenzel, Davis, Kessner & Kuester, Lincoln, for appellee.
Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.
HASTINGS, Justice.
The plaintiff Association filed its petition in the Court of Industrial Relations (CIR) seeking to require the defendant College to enter into mandatory bargaining concerning the matter of "workload" as it applied to faculty, counselors, vocational evaluators, and librarians of the College. The CIR held that workload, or perhaps more accurately, "contact hours," was a bargainable issue and directed the parties to proceed to negotiate their differences. The College has appealed.
The College is a technical community college under the provisions of section 79-2636 et seq., R.R.S.1943, and as such its board of governors is charged with the general supervision, control, and operation of this particular college located in Omaha. The board is responsible to develop programs of vocational and technical education, employ staff, prescribe courses of study, promulgate rules and regulations necessary or appropriate to the administration of the institution, and control the various fiscal operations. § 79-2644, R.R.S.1943. The Association is the exclusive collective bargaining representative of the College's full-time instructors, counselors, vocational evaluators, and campus librarians under the provisions of section 48-801, R.R.S.1943. As such representative, it is authorized to negotiate with the College as to wages, hours, and conditions of employment. § 48-838(4), R.R.S.1943. The CIR is empowered to order employers and employees who have refused to bargain in good faith, regarding wages, hours, or conditions of employment, to proceed to negotiate. § 48-816, R.R.S. 1943.
"Contact hours" are 50 minutes in length and generally, as to instructors, refer to those times when the instructor must be available in the classroom, laboratory, or clinic for teaching purposes, and as to counselors and evaluators, those scheduled hours during which they will be available to students for counseling, testing, and evaluation. Concerning librarians, the term refers to those hours when they are "on duty" in the library. Presently the "teaching load" for faculty has been fixed by the College at 24 hours per 40-hour week and is set forth in the "Notice of Appointment" signed by both the employee and president of the College. A similar document for all other employees with which we are here concerned simply refers to a minimum 40-hour workweek and makes no provision for "workload," "contact hours," or "duty hours."
During negotiations of wages and other terms and conditions of employment for the 1977-1978 contract year, the Association proposed that faculty "contact hours" be set at a maximum of 14 hours per week and "contact or duty hours" for counselors, evaluators, and campus librarians be established at 28 hours per week. The College refused to negotiate, alleging that "workload" was "predominately a matter of educational policy, management prerogative, and/or constitutes a demand for bargaining over the statutory duties of the Board of Governors of the Metropolitan Technical Community College Area." This litigation then followed.
The CIR in its opinion rejected consideration of the College's evidence as to its educational philosophy and its effect on whether "contact hours" are conditions of employment or educational policy. Rather, it concluded that the only question for the court *203 to decide was whether it should adhere to its prior precedent or overrule it. After referring to cases involving the Seward Educational Association, Norfolk Educational Association, and Fremont Educational Association, wherein the CIR had held that school calendar, hours at school, and planning time were mandatory subjects of bargaining, its opinion goes on to say: "After the Fremont case was decided, the Supreme Court decided the Seward appeal, 188 Neb. 772, 784, 199 N.W.2d 752 (1972). In dicta, the Supreme Court listed the right to schedule work as a management prerogative, possibly but not necessarily contrary to our holdings. If we were to decide the question initially today, we might well decide it differently. However, it seems more important to us that items once decided and relied on for over six years remain decided."
In School Dist. of Seward Education Assn. v. School Dist. of Seward, 188 Neb. 772, 199 N.W.2d 752 (1972), which the CIR referred to as the "Seward appeal," this court said: "The next question raised involved an interpretation of the language `conditions of employment.' While the issue may be moot because the parties did reach agreement on all points referred except wages we do feel some observations are pertinent. Generally, teacher organizations have given the term `conditions of employment' an extremely broad meaning, while boards of education have tried to restrict that term to preserve their management prerogatives and policy-making powers. While there are many nebulous areas that may overlap working conditions, boards should not be required to enter negotiations on matters which are predominately matters of educational policy, management prerogatives, or statutory duties of the board of education. Kansas, by statute, has defined conditions of employment to include hours of work, vacation allowances, sick and injury leave, number of holidays, and wearing apparel. K.S.A.1971 Supp., S. 75-4322(s). Without trying to lay down any specific rule, we would hold that conditions of employment can be interpreted to include only those matters directly affecting the teacher's welfare. Without attempting in any way to be specific, or to limit the foregoing, we would consider the following to be exclusively within the management prerogative: The right to hire; to maintain order and efficiency; to schedule work; to control transfers and assignments; to determine what extracurricular activities may be supported or sponsored; and to determine the curriculum, class size, and types of specialists to be employed." (Emphasis supplied.)
The only witness for the Association was Melvin Solotorovsky, who was employed by the College as an air-conditioning and heating inspector. He is also chairman of the welfare committee of the Association and head of its negotiation team, and, by inference at least, it can be assumed that he is a member of the College's faculty. After outlining the nature of the dispute and the Association's demands as stated above, he went on to explain the need for "non-contact time." He said that such time was necessary in which to prepare lesson plans; to do research, i. e., in order to keep up with new trends and technological changes in an instructor's particular field; to grade tests; to serve on committees; and other similar duties. However, he made no case at all for employees other than instructors. He also conceded that the amount of time which a teacher spends in direct contact with the student is "very critical" in its effect on the education attained.
The College presented three witnesses: The dean of administrative services, the director of finance and business, and the president, Dr. Marm Harris. These witnesses pointed out that a reduction in "contact hours," with no other changes, would force elimination of six programs which are not courses, but an entire listing of courses in a particular career field. On the other hand, if the solution was to be a reduction in the number of students, the College would face a financial squeeze because the amount of state aid has a direct relationship to enrollment.
Particular emphasis was placed on the philosophy of education as espoused by Dr. Harris. This was what he called the "individualized *204 self-paced" method of instruction. Without going into great detail, this method recognizes that each student has different aptitudes, ability, and experience, and by using the traditional "lecture method," where each student is brought along with the entire class, the brighter ones become bored and drop out of the program. The individualized method, according to the witness, places some of the responsibility for learning on the student. After a preliminary introduction to a particular phase of the program, each student progresses at his or her own speed and the instructor must be available in the classroom to give individualized help to each student as the need arises. In other words, the instructor is dealing with several levels of instruction and learning going on during the same period and, rather than being just a lecturer, the instructor is a "facilitator or a classroom manager that is available at the critical times that the student needs him." This method, according to the witness, requires more "student contact hours" than the traditional method of teaching, but is the educational philosophy dictated by the board of governors at his request.
Dr. Harris also pointed out that there is no requirement for independent research or publication on the part of the faculty as a prerequisite to retention or promotion. At a technical school such as the College, according to the witness, "It is not our job to increase or expand knowledge. It is our job to take the basic information and teach that to students, keeping in mind that we are talking about freshman-sophomore level students. We are a two-year school. We are not talking about juniors and seniors or graduate students." He goes on to point out that 96.5 percent of all the credit hours generated at the College during the previous year came from vocational technical students and 3.5 percent from academic students.
The parties agree, and their position is supported by both case law and statutes, that matters which are predominately matters of educational policy and management prerogative are not subject to mandatory negotiation, whereas conditions of employment are. School Dist. of Seward Education Assn. v. School Dist. of Seward, 188 Neb. 772, 199 N.W.2d 752 (1972); § 48-816, R.R.S.1943. It is also obvious the number of "contact hours" or "duty hours" which must be spent out of the 40-hour workweek has some effect on whether it is an easy job or a difficult job and these hours are therefore, to that extent, "conditions of employment." By the same token, if the number of "contact hours" requires a change in the philosophy of education, the number of teachers needed, the scope of the program offered, the number of students, or the amount of financial aid, as was demonstrated by the record, it affects educational policy and management prerogatives.
The College recognized this dichotomy, or perhaps more accurately this overlapping, in its formal response to the Association's demand for negotiation. In that document the College said: "The allocation of the time and energies of its faculty are consequences of the College's basic educational policy. This is an area of management prerogative and policy-making powers, reserved to the Board of Governors of the College. Accordingly, we decline to bargain concerning the number of hours within the work week that are to be allocated to classroom time, laboratory time or other time in contact with students. However, this is not to say that we decline to bargain, at the appropriate time, concerning the affects [sic] of the Board's allocation of faculty's time on the wages of bargaining unit employees." (Emphasis supplied.)
In our review of orders and decisions of the CIR, we are restricted to considering whether the order of that court is supported by substantial evidence justifying the order made, whether it acted within the scope of its statutory authority, and whether its action was arbitrary, capricious, or unreasonable. American Assn. of University Professors v. Board of Regents, 198 Neb. 243, 253 N.W.2d 1 (1977). We have reviewed the evidence in some detail and have set forth the general statutory authority of the CIR. The problem is to determine whether *205 "workload" is a condition of employment or a prerogative of management.
A reference to the decisions of other jurisdictions, although not necessarily determinative of the issue, is nevertheless helpful. All seem to agree generally that a balancing test is needed. In Dunellen Bd. of Ed. v. Dunellen Ed. Assn., 64 N.J. 17, 311 A.2d 737 (1973), the court said: "* * * it would appear evident that the consolidation of chairmanships represents a matter predominantly of educational policy within management's exclusive prerogatives * *" (emphasis supplied), citing School Dist. of Seward Education Assn. v. School Dist. of Seward, supra.
In Burlington Cty. Col. Fac. Assoc. v. Bd. of Trustees, 64 N.J. 10, 311 A.2d 733 (1973), the New Jersey court said: "It negotiated on the matters directly and intimately affecting the faculty's working terms and conditions, such as compensation, hours, work loads, * * *." (Emphasis supplied.)
The final case in the New Jersey trilogy, Bd. of Ed. Englewood v. Englewood Teachers, 64 N.J. 1, 311 A.2d 729 (1973), provided that: " * * * major educational policies which indirectly affect the working conditions of the teachers remain exclusively with the Board and are not negotiable whereas items which are not predominantly educational policies and directly affect the financial and personal welfare of the teachers do not remain exclusively with the Board and are negotiable."
The Alaska Supreme Court has indicated the amount of paid time available to a teacher for preparation of lesson plans affects the teacher directly and is negotiable; a demand that such time be available during the academic portion of the day presents a policy question. Kenai Peninsula Borough v. Kenai Peninsula Ed., 572 P.2d 416 (Alaska, 1977). That court recognized "If teachers' unions are permitted to bargain on matters of educational policy, it is conceivable that through successive contracts the autonomy of the school boards could be severely eroded, and the effective control of educational policy shifted from the school boards to the teachers' unions." It quoted the following language from National Ed. Assn. of Shawnee Mission, Inc. v. Board of Ed., 212 Kan. 741, 512 P.2d 426 (1973): "`The key, as we see it, is how direct the impact of an issue is on the well-being of the individual teacher, as opposed to its effect on the operation of the school system as a whole.'" The court went on to say, " * * * a matter is more susceptible to bargaining the more it deals with the economic interests of employees and the less it concerns professional goals and methods." Put another way, the court explained that those items which are "so closely connected with the economic well-being of the individual teacher" must be held negotiable.
A provision that secondary teachers not be required to teach more than 25 periods per week, after having been held nonbargainable as a matter of inherent managerial policy by an intermediate court of Pennsylvania, was referred back to the appropriate administrative agency for reassessment in Pennsylvania Lab. Rel. Bd. v. State Col. A. Sch. Dist., 461 Pa. 494, 337 A.2d 262 (1975). Citing the same language from Shawnee Mission as was set out in Kenai Peninsula, the court went on to say: "Thus we hold that where an item of dispute is a matter of fundamental concern to the employees' interest in wages, hours and other terms and conditions of employment, it is not removed as a matter subject to good faith bargaining under section 701 simply because it may touch upon basic policy."
Although holding that teacher load was a mandatory subject of negotiations, the court in West Hartford Education Assn., Inc. v. DeCourcy, 162 Conn. 566, 295 A.2d 526 (1972), went on to say: "Suffice it to say that, at the very least, matters of educational policy are those which are fundamental to the existence, direction and operation of the enterprise."
The majority opinion in City of Biddeford v. Biddeford Teachers Ass'n., 304 A.2d 387 (Me., 1973), held that the Legislature's attempt to delegate to arbitrators binding determination of labor disputes involving *206 "`Length of a Teacher's Working Day'" was void for lack of adequate standards. However, the concurring opinion of Wernick, J., is somewhat enlightening. "Similarly, the length of the school day in terms of the number of hours the teacher will be required to teach or be in attendance at school, is a matter concerning which the `working conditions' interests of teachers are fundamentally inseparable from a plurality of non-teacher considerations involving important `managerial' and `policy' areas.
"While it is clear that the number of hours which any individual teacher shall be required to work in a given day need not coincide with the number of hours the students are obliged to be in attendance at school, this fact by itself fails to establish that the length of the teacher's school day may be isolated as a proper subject of mandatory collective bargaining. * * * negotiations aimed at shortening the work-day of teachers would necessarily become directed toward seeking alternatives to the hiring of additional personnel. * * *
"Thus, the length of the teacher's working day is closely and heavily interwoven with judgments bearing upon the welfare of the students,as reflected in the ultimate quality of their education and the extent to which it may be improved or weakened by use of various types of substitutes, technological or otherwise, for the living presence and active participation of teachers. Such foundational educational value judgments cannot reasonably be subordinated to the overlay of teacher `working conditions', and for this reason, the length of the teacher's working day must be held, fundamentally, that kind of `educational policies' subject-matter which was legislatively intended to remain outside the scope of mandatory collective bargaining and, therefore, of binding arbitration."
Only subject matters that are primarily related to wages, hours, or conditions of employment are mandatorily bargainable in Wisconsin. In Beloit Education Asso. v. WERC, 73 Wis.2d 43, 242 N.W.2d 231 (1976), the court said: "Some [courts] limit required bargaining to matters `directly' related to `wages, hours and conditions of employment.' Some make the test whether the subject matter is `significantly' related to `wages, hours and conditions of employment.' Some make the test whether the subject `materially' affects the working conditions. Commen[t]ators appear to agree that drawing the line or making the distinction is not easy." In opting for the test "primarily related to wages or hours or conditions of employment" as being mandatorily bargainable, the court went on to say: "The dictionary defines `primarily' as meaning `fundamentally.' It is in this sense of the word that `primarily' is here used. What is fundamentally or basically or essentially a matter involving `wages, hours and conditions of employment' is, under the statute, a matter that is required to be bargained. The commission construed the statute to require mandatory bargaining as to (1) matters which are primarily related to `wages, hours and conditions of employment,' and (2) the impact of the `establishment of educational policy' affecting the `wages, hours and conditions of employment.'"
A matter which is of fundamental, basic, or essential concern to an employee's financial and personal concern may be considered as involving working conditions and is mandatorily bargainable even though there may be some minor influence on educational policy or management prerogative. However, those matters which involve foundational value judgments, which strike at the very heart of the educational philosophy of the particular institution, are management prerogatives and are not a proper subject for negotiation even though such decisions may have some impact on working conditions. However, the impact of whatever decision management may make in this or any other case on the economic welfare of employees is a proper subject of mandatory bargaining.
At the outset it should be said that all of the cases cited from other jurisdictions together with those from the CIR involve purely academic and mostly elementary educational *207 units rather than a technical vocational school as involved here. There is an obvious difference in the requirements made of both management and faculty. It appears the CIR failed to recognize that distinction because by its own opinion, it failed to consider the evidence of the College and relied wholly on its past decisions in cases involving elementary and secondary academic institutions.
We find the evidence supports the College's position that the number of instructor contact hours involves a foundational value judgment which is essential to its basic educational and learning philosophy and is therefore a prerogative of management and is not bargainable. The evidence completely fails to support any justification for reducing contact hours of counselors or evaluators or duty hours of librarians below the basic work week and is not negotiable.
Inasmuch as there is no substantial evidence supporting the order made by the CIR, its action must be held to be arbitrary, capricious, and unreasonable. Therefore, the judgment is reversed and the Association's cause of action is ordered dismissed.
REVERSED AND DISMISSED.