534 A.2d 980

**MONTGOMERY COUNTY EDUCATION ASSOCIATION, INC.**

v.

**BOARD OF EDUCATION OF MONTGOMERY COUNTY.**

**No. 57, Sept. Term, 1986.**

Court of Appeals of Maryland.

Dec. 28, 1987.

James R. Whattam (Walter S. Levin, on the brief), Baltimore, for appellant.

Roger W. Titus (Titus, Glasgow, on the brief), Rockville, for appellee.

Argued Before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, COUCH * and McAULIFFE, JJ., and MARVIN H. SMITH (retired) Specially Assigned.

ELDRIDGE, Judge.

Maryland Code (1978, 1985 Repl.Vol.), § 6–408(b)(1) of Education Article, empowers a public school employer and its employees' designated representatives to "meet and negotiate" a collective bargaining agreement relating to "salaries, wages, hours, and other working conditions." Section 6–408(a)(2) of the Education Article permits the parties to "provide for binding arbitration of grievances arising under the [collective bargaining] agreement that the parties have agreed to be subject to arbitration." This case requires us to decide whether the employees' designated representatives may require a public school employer to negotiate, and thus possibly to arbitrate, the issues of the school calendar and job reclassification.[1]

## I.

The Montgomery County Education Association, Inc. ("MCEA") is the designated representative for teachers and certain other professional personnel employed by the Mont-

---

* Couch, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

**1.** The school calendar sets the beginning and end of the school year. In addition, the calendar determines the days during the school year on which the schools are open for instructional purposes and for teacher "duty days." Conversely, the calendar determines the days during the school year on which the schools are closed for holidays and teacher "professional days." *See Bd. of Educ. v. Montgomery Co. Ed. Ass'n,* 66 Md.App. 729, 731 n. 1, 505 A.2d 905 (1986); *MCEA v. Board of Educ. of Montgomery Co.,* No. 70–1, 1 Opinions of the Md. State Bd. of Educ. 35, 36 (1970).

Reclassification occurs when, as a result of reassessment of an employee's duties and responsibilities, a supervisor decides to assign the employee a new "classification" or status. This reclassification may result in an increase or a reduction of the employee's salary.

gomery County Board of Education ("the County Board"). In 1970, MCEA claimed that the County Board had violated the collective bargaining agreement then in force by unilaterally adopting a school calendar and reclassifying staff positions. The State Board of Education, however, ruled that the County Board was not obliged to negotiate either of these issues. *MCEA v. Board of Educ. of Montgomery Co.*, No. 70–1, 1 Opinions of the Md. State Bd. of Educ. 35 (1970) ("Opinion 70–1"). According to the State Board, establishing a school calendar was a local board's "prerogative." Moreover, in the State Board's view, reclassification decisions rested in a local board's "complete control" and were therefore "non-negotiable."

Over the next thirteen years, the parties negotiated several collective bargaining agreements, and MCEA did not challenge Opinion 70–1. While the parties were negotiating a new collective bargaining agreement in 1983, however, MCEA submitted an initial proposal that included the subjects of the school calendar and job reclassification. Relying on Opinion 70–1, the County Board declined to negotiate with regard to these subjects. MCEA then brought its case before the State Board, asking it to overrule Opinion 70–1 and to order the County Board to negotiate these issues.[2]

The State Board referred the matter to a Hearing Examiner. Before the Hearing Examiner, MCEA advanced a broad, literal interpretation of § 6–408(b)(1). Under this interpretation, any matter that relates, apparently even tangentially, to "salaries, wages, hours, and other working conditions," could be subject to collective bargaining. MCEA contended that the calendar related to working conditions and that job reclassification related to salary; therefore, MCEA concluded, both issues were negotiable. The County Board, on the other hand, urged a narrower

---

2. MCEA originally characterized its claims as a "Charge of Unfair Labor Practice." The State Board, however, adopted its Hearing Examiner's recommendation that the action be treated as a request for a declaratory ruling and for reconsideration of Opinion 70–1.

interpretation, which would ensure that the Board, and not an arbitrator, would carry out the Board's statutory duties to determine and implement educational policy.

On the calendar issue, the Hearing Examiner concluded that Opinion 70–1's original rationale was still valid; therefore, she recommended that the State Board reaffirm this aspect of its prior opinion. As to the reclassification issue, the Hearing Examiner concluded that subjecting such decisions to collective bargaining would lead to continual negotiations between the County Board and its three unions. This in turn, she believed, would create chaos in the management function and erode the statutory provisions that empower local boards to manage public school systems. Nevertheless, she recommended that the State Board modify Opinion 70–1 to require the County Board to negotiate with respect to an "across-the-board" provision that would protect employees whose salaries had been reduced by reclassification.

The State Board adopted the Hearing Examiner's findings of fact and conclusions of law, except for the final recommendation that Opinion 70–1 be modified in part. According to the State Board, a requirement that the County Board negotiate concerning a provision to protect employees adversely affected by reclassification would lead to the same difficulties that would arise from a requirement that the County Board negotiate reclassification issues in general. Adopting MCEA's terminology, the State Board concluded that such a provision was not a "mandatory" subject of collective bargaining. *MCEA v. Board of Educ. of Montgomery Co.,* No. 84–31, 3 Opinions of the Md. State Bd. of Educ. 602 (1984).

MCEA filed in the Circuit Court for Montgomery County an action for judicial review of the State Board's decision. The circuit court agreed with the State Board's conclusion that the school calendar was nonnegotiable. The court held, however, that the salary impact of reclassification decisions was a "mandatory" subject of collective bargain-

ing, and the court reversed this aspect of the State Board's decision.

Both the County Board and MCEA appealed to the Court of Special Appeals. In a reported opinion, the intermediate appellate court affirmed in part and reversed in part, stating that "the 'true intent and meaning' of § 6–408(b) is laced with educational policy considerations" and that "the State Board's decision should therefore have been regarded as final." *Bd. of Educ. v. Montgomery Co. Educ. Ass'n,* 66 Md.App. 729, 743–744, 505 A.2d 905 (1986).[3]

MCEA filed a petition for a writ of certiorari. Because of the importance of the issues presented, we granted the petition.

## II.

Initially, MCEA asserts that the Court of Special Appeals gave "the State Board absolute, total, final, and unreviewable authority over any matter involving educational policy," and that "this is a completely inaccurate

---

**3.** Generally with regard to issues arising in actions to review decisions of the State Board of Education, the Court of Special Appeals attempted to classify all such issues in three categories, and attempted to delineate a scope of judicial review for each category. We question whether this approach is workable or legally sound. The principles governing judicial review of State Board decisions are set forth in *Board of Education v. Waeldner,* 298 Md. 354, 470 A.2d 332 (1984); *Board of Educ., Garrett County v. Lendo,* 295 Md. 55, 453 A.2d 1185 (1982); *Resetar v. Board of Education,* 284 Md. 537, 399 A.2d 225, *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979); *Board of Education v. Crawford,* 284 Md. 245, 395 A.2d 835 (1979); *Zeitschel v. Board of Education,* 274 Md. 69, 332 A.2d 906 (1975); *Halsey v. Board of Education,* 273 Md. 566, 331 A.2d 306 (1975); *Wilson v. Board of Education,* 234 Md. 561, 565–566, 200 A.2d 67 (1964); *Metcalf v. Cook,* 168 Md. 475, 478, 178 A. 219 (1935); *School Com. of Car. Co. v. Breeding,* 126 Md. 83, 88–90, 94 A. 328 (1915); *School Commissioners v. Morris,* 123 Md. 398, 402–404, 91 A. 718 (1914); *Zantzinger v. Manning,* 123 Md. 169, 178–182, 90 A. 839 (1914); *Underwood v. School Board,* 103 Md. 181, 188–189, 63 A. 221 (1906); and *Wiley, et al., Trustees v. Board Co. School Comm'rs of Allegany Co.,* 51 Md. 401, 405–406 (1879). *See also Bd. of Ed. for Dorchester Co. v. Hubbard,* 305 Md. 774, 788–791, 506 A.2d 625 (1986); *Hunter v. Bd. of Educ., Mont. Co.,* 292 Md. 481, 488–489, 439 A.2d 582 (1982).

reading of prior Maryland cases dealing with the scope of judicial review of State Board decisions." (MCEA's brief, p. 10). MCEA goes on to argue that the disputes in this case involve statutory interpretation, namely an interpretation of § 6–408(b)(1) of the Education Article which delineates the scope of collective bargaining negotiations. According to MCEA, this question of statutory interpretation is principally for the reviewing court to resolve, as "courts have far greater expertise in this area of statutory construction than the legally unskilled members of the State Board of Education." (*Id.* at 16). MCEA concludes that the State Board's interpretation of § 6–408(b)(1) is erroneous.

It is true that, under our cases, a reviewing court should not always defer entirely to the State Board's interpretation of a statute. If the State Board's interpretation or application of § 6–408(b)(1), in a particular situation, would clearly be contrary to the statute's plain meaning, a reviewing court must reject that interpretation. *See, e.g., Board of Educ., Garrett Co. v. Lendo,* 295 Md. 55, 453 A.2d 1185 (1982). We disagree, however, with MCEA's position that reviewing courts should consider virtually *de novo* the State Board's resolution of issues arising under § 6–408(b)(1).

For a number of reasons, the State Board's interpretation and application of § 6–408(b)(1) is entitled to a great deal of deference from reviewing courts. An agency's interpretation of the statute it administers is generally entitled to weight. *Bd. of Ed. for Dorchester Co. v. Hubbard,* 305 Md. 774, 790–791, 506 A.2d 625, 633 (1986); *Comm'n on Hum. Rel. v. Mass Transit,* 294 Md. 225, 233, 449 A.2d 385, 389 (1982), and cases there cited. This principle is particularly important in the case of the State Board of Education. As pointed out in *Bd. of Ed. for Dorchester Co. v. Hubbard, supra,* 305 Md. at 791, 506 A.2d at 633, "the paramount role of the State Board of Education in interpreting the public education law sets it apart from most administrative agencies." Section 2–205(e)(1) of the Education Article of the Code provides that the State Board "shall explain the true intent and meaning" of the Education Article and the

bylaws, rules, and regulations promulgated thereunder. In addition, § 2–205(e)(3) provides that, in controversies and disputes under the above provisions, the State Board's decision is "final." These broad powers necessarily circumscribe the scope of judicial review of State Board decisions.

Moreover, unlike some other issues, the interpretation of § 6–408(b)(1) is fraught with questions of educational policy. The General Assembly has charged the State Board, not the courts, with the duty of determining the elementary and secondary educational policies of the State. § 2–205(b)(1). This duty must further circumscribe the scope of judicial review under § 6–408(b)(1).

There are two additional reasons for deference in this case. First, MCEA has drawn into question the State Board's longstanding interpretation of § 6–408(b)(1), an interpretation that was adopted almost contemporaneously with the enactment of that statute and that the General Assembly has left unchanged. Courts generally should defer to such interpretations. *Board of Educ., Garrett Co. v. Lendo, supra,* 295 Md. at 63, 453 A.2d at 1189. Second, the resolution of the issues involved in this case could have a substantial impact on the State Board's authority. As we observed in *Hubbard, supra,* where we discussed, but declined to decide, these issues (305 Md. at 791–792, 506 A.2d at 633–634):

"The ... [employees] have ... argued for an extremely broad interpretation of the statutory phrase 'all matters that relate to salaries, wages, hours, and other working conditions.' Literally, almost any educational matter may relate to an employee's 'working conditions' in the broadest sense of the term. In fact, at oral argument before us, one of the counsel for the [employees] was unable to produce an example, other than a tenure decision, of an educational matter which would not fall within the scope of collective bargaining under the [employees'] reading of the statutory language. If such interpretation is correct, arbitrators could in the future be making many of the educational policy decisions which have heretofore been

made by the local boards of education and the State Board of Education.

"On the other hand, the General Assembly may have contemplated that a somewhat narrower scope be given to the concept of 'matters' relating 'to salaries, wages, hours, and other working conditions,' perhaps intending (as was argued before us) to draw a line between educational policy matters and wages, hours, salaries and other working conditions. If so, such a line will be somewhat elusive in many contexts, and application of the State Board of Education's expertise would clearly be desirable before a court attempts to resolve the matter."

Consequently, we reject MCEA's contention that a reviewing court should accord little or no deference to the State Board's construction and application of § 6–408(b)(1).

### III.

In the course of its argument concerning the proper construction of § 6–408(b)(1), MCEA contends that the statute merely authorizes but does not require local boards to engage in collective bargaining on many matters that might fall within the section's ambiguous terms. To this end, MCEA distinguishes "mandatory" subjects of collective bargaining, which a local board must agree to negotiate, from "permissive" subjects, which a local board may but need not agree to negotiate, and "illegal" subjects, which a local board may never agree to negotiate. MCEA claims that these three categories are accepted in public sector labor law. In our view, however, the three categories are neither uniformly accepted elsewhere nor consistent with Maryland law.

These categories evolved in private sector labor law under the definition of collective bargaining in § 8(d) of the National Labor Relations Act, 29 U.S.C. § 158(d) (1982). *See Fibreboard Corp. v. N.L.R.B.*, 379 U.S. 203, 223, 85 S.Ct. 398, 409, 13 L.Ed.2d 233, 246 (1964) (Stewart, J., concurring); *N.L.R.B. v. Sheet Metal Workers Intern., etc.*, 575 F.2d 394, 397 (2d Cir.1978). As one state court ob-

served, however, "it does not necessarily follow that federal precedent relating to private employment is particularly helpful in resolving the difficulties arising in the public sector." *Pennsylvania L. R. Bd. v. State Col. A.S.D.*, 461 Pa. 494, 499, 337 A.2d 262, 264 (1975).

It is true that a number of state courts utilize these three categories in public employee collective bargaining decisions; however, this is often because the pertinent public sector collective bargaining statute creates or has been construed to create a "permissive" category, *City of Fort Dodge v. Iowa P.E.R.B.*, 275 N.W.2d 393, 395 (Iowa 1979) (construing Iowa Code Ann. § 20.9 (1978)); *Pennsylvania L. R. Bd., supra,* 461 Pa. at 501, 337 A.2d at 265 (Pa.Stat. Ann. tit. 43, § 702 (Purdon Supp.1987); *Beloit Educ. Ass'n v. WERC,* 73 Wis.2d 43, 242 N.W.2d 231 (1976) (construing Wis.Stat.Ann. § 110.70(1)(d) (West 1974); or because the pertinent collective bargaining statute is deemed *in pari materia* with § 8(d) of the National Labor Relations Act, *West Hartford Education Assn., Inc. v. DeCourcy,* 162 Conn. 566, 578, 295 A.2d 526, 533 (1972) (Conn.Gen.Stat. § 10–153(d) (1987)); *Incorporated Village of Lynbrook v. New York State Pub. Emp. Relations Bd.,* 48 N.Y.2d 398, 402–403 n. 1, 423 N.Y.S.2d 466, 467 n. 1, 399 N.E.2d 55, 57 n. 1 (1979) (N.Y.Civ.Serv.Law § 204, subd. 3 (Lawyer's Coop. 1982)); *Springfield Education Assn. v. School Dist.,* 290 Or. 217, 235–236, 621 P.2d 547, 559 (1980) (Or.Rev.Stat. § 243.650(4) (1985)). *See also Minn. Arrowhead Dist., etc. v. St. Louis Cty.,* 290 N.W.2d 608, 611 (Minn.1980).

On the other hand, several courts simply recognize a dichotomy between negotiable and nonnegotiable subjects, with no intermediate category. *See, e.g., Kenai Peninsula Borough v. Kenai Peninsula Ed.,* 572 P.2d 416, 423 (Alaska 1977); *Metro. Tech. Com. Col. Ed. Assn. v. Metro. Tech. Com. Col. Area,* 203 Neb. 832, 837–838, 281 N.W.2d 201, 204 (1979). And at least one court has expressly held that, under its state law, no permissive category exists. *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.,* 78 N.J. 144, 162, 393 A.2d 278, 287 (1978).

As the existence of a "permissive" category depends on the applicable collective bargaining statute, we turn to an examination of Maryland law.

In construing § 6–408(b)(1), we must keep in mind the well-established principle that, absent express legislative authority, a government agency may not enter into binding arbitration agreements under which an arbitrator establishes the wages, hours, etc., for public employees. *Office & Prof. Employees Int'l v. MTA*, 295 Md. 88, 97, 453 A.2d 1191, 1195 (1982); *Maryland Cl. Emp. Ass'n v. Anderson*, 281 Md. 496, 508–513, 380 A.2d 1032, 1038–1041 (1977); *Mugford v. City of Baltimore*, 185 Md. 266, 270–271, 44 A.2d 745, 747 (1945). The purpose of this rule is to insure that a governmental agency does not, without authority, abdicate or bargain away its statutory discretion. *See Maryland Cl. Emp., supra*, 281 Md. at 508, 380 A.2d at 1038; *Mugford, supra*, 185 Md. at 270, 44 A.2d at 747.

Section 6–408(b)(1) constitutes the sole authorization for local boards of education to engage in collective bargaining. In this section, the General Assembly employed mandatory language: "[A] public school employer ... *shall* meet and negotiate ... on all matters that relate to salaries, wages, hours, and other working conditions." (Emphasis added). Any particular subject either will or will not fall within the scope of this provision. If a subject falls within the provision, the language of the statute makes it a mandatory subject of collective bargaining. If it does not come within this provision, there is no other legislation authorizing collective bargaining and arbitration with regard to the subject, and, under our cases, a local board would be without authority to negotiate a binding arbitration agreement covering the matter. Therefore, under § 6–408(b)(1) and this Court's decisions, a local board is either required to agree to negotiate a particular subject, or it is not permitted to agree to negotiate that subject. Maryland law leaves no room for subjects that a local board may, but need not, agree to negotiate.

This conclusion, to some extent, undermines MCEA's construction of § 6–408(b)(1). Counsel for MCEA acknowledged at oral argument in this case that, under MCEA's construction, "just about everything" would fall within the scope of § 6–408(b)(1). He justified this construction by contending that, in many instances, local boards would be permitted, but not required, to agree to engage in collective bargaining. But because Maryland law contains no such "permissive" category, under MCEA's construction, local boards would be required, rather than merely permitted, to negotiate "just about everything." Thus, MCEA would read § 6–408(b)(1) more broadly than even § 8(d) of the National Labor Relations Act, which does not mandate collective bargaining on subjects that lie at the core of entrepreneurial control. *Fibreboard Corp. v. N.L.R.B.*, *supra*.

## IV.

As noted above, under MCEA's interpretation of § 6–408(b)(1), a local board would be required to negotiate any matter, except perhaps a tenure provision,[4] that in any way "relates to salaries, wages, hours, and other working conditions." It is readily apparent that many such matters also involve questions of educational policy, which local boards and the State Board of Education are charged by statute to determine and implement. In order to exempt educational policy determinations from the collective bargaining process, the State Board rejected MCEA's interpretation. We believe that the State Board's position is reasonable.

Under MCEA's interpretation, a local board and the employees' representative could together completely remove the State Board's authority in a county. The local board

---

**4.** Section 6–411(a) specifically exempts from the scope of § 6–408(b)(1) "rules and regulations that establish and regulate tenure." *See Bd. of Educ. v. Carroll Co. Educ. Ass'n*, 53 Md.App. 355, 452 A.2d 1316 (1982).

and the representative might preempt particular State Board directives by entering into binding arbitration agreements on innumerable matters of educational policy. In requiring collective bargaining with public school employees, we do not believe that the General Assembly intended to authorize local boards thus to evade their statutory duty to carry out the State Board's policies. *See* §§ 4–107(1), 4–204.

Moreover, MCEA's interpretation might be plausible only if one reads § 6–408(b)(1) in isolation and not in the context of the entire subtitle of which it is a part. Section 6–411(a) of the Education Article provides: "This subtitle does not supercede any other provision of the Code...." But numerous Code provisions charge local boards with substantial responsibility in matters of educational policy. For example, § 4–101(a) vests in a local board control over educational matters that affect the county. Section 4–107(1) states that a local board shall to the best of its ability carry out the applicable provisions of the Education Article and the State Board's bylaws, rules, and regulations. Section 4–107(2) requires a local board to maintain a reasonably uniform system of public schools. Section 4–107(3) states that, subject to the provisions of the Education Article and to the State Board's bylaws, rules, and regulations, a local board shall determine the educational policies of the county school system. Finally, § 4–204 requires the county superintendent—the local board's executive officer—to see that the policies of the State Board and the local board are carried out.

Thus, § 6–411(a) makes it clear that a local board's duty to engage in collective bargaining "does not supercede" its statutory authority to determine and implement educational policy, and to administer the public schools within its jurisdiction. Rather, § 6–411(a) suggests a dichotomy between "matters that relate to salaries, wages, hours, and other working conditions," which are negotiable, and matters of educational policy, which are not.

As many courts have observed, however, no clear line distinguishes matters of educational policy from matters subject to collective bargaining. *See, e.g., Kenai Peninsula Borough v. Kenai Peninsula Ed., supra,* 572 P.2d at 422; *West Hartford Education Assn., Inc. v. DeCourcy, supra,* 162 Conn. at 581, 295 A.2d at 534; *School Dist. of Seward Education Assn. v. School Dist. of Seward,* 188 Neb. 772, 784, 199 N.W.2d 752, 759 (1972). For example, matters that fall directly under § 6–408(b)(1) such as salary levels and hours of work also implicate educational policy considerations: higher salaries for some teachers may be necessary to attract or retain qualified personnel, and longer hours may enhance educational achievement. *See Kenai, supra; National Education Association v. Board of Education,* 212 Kan. 741, 753, 512 P.2d 426, 435 (1973). In fact, virtually every managerial decision in some way relates to "salaries, wages, hours, and other working conditions," and is therefore arguably negotiable. At the same time, virtually every such decision also involves educational policy considerations and is therefore arguably nonnegotiable. Consequently, to determine whether a particular matter falls within § 6–408(b)(1), the State Board has balanced the interests of employees against the interests of the school system as a whole.

We can hardly find this balancing approach unreasonable. Section 6–408(b)(1) is capable of two extreme interpretations, neither of which the General Assembly could have intended. By mandating collective bargaining on any matter that relates to "salaries, wages, hours, and other working conditions," the first interpretation would place most educational policy decisions on the table. On the other hand, by exempting from § 6–408(b)(1) any question of educational policy, the second interpretation would practically nullify the mandate to engage in collective bargaining.

In rejecting both extreme approaches and choosing instead to balance competing interests, the State Board has given effect to § 6–408(b)(1). The balancing approach uti-

lized by the State Board exempts from collective bargaining those matters that predominantly concern the determination of educational policy but preserves the local board's duty to negotiate matters of direct fundamental concern to employees. *See, e.g., Kenai, supra; National Education Association v. Board of Education, supra; Dunellen Bd. of Ed. v. Dunellen Ed. Assn.*, 64 N.J. 17, 29, 311 A.2d 737, 743 (1973); *School Dist. of Seward Education Assn., supra; Pennsylvania L.R. Bd. v. State Col. A.L.D., supra*, 461 Pa. at 507, 337 A.2d at 268; *Aberdeen Ed. Ass'n v. Aberdeen Bd. of Ed. Ind. Sch. D.*, 88 S.D. 127, 133, 215 N.W.2d 837, 841 (1974); *Beloit Educ. Ass'n v. WERC, supra*, 73 Wis.2d at 54, 242 N.W.2d at 236.

Moreover, this approach reflects the State Board's recognition of the unique nature of collective bargaining between local boards and public school employees. Local boards are state agencies, and, as such, are responsible to other appropriate state officials and to the public at large. Unlike private sector employers, local boards must respond to the community's needs. Public school employees are but one of many groups in the community attempting to shape educational policy by exerting influence on local boards. *See Abood v. Detroit Board of Education*, 431 U.S. 209, 222–229, 97 S.Ct. 1782, 1795–1796, 52 L.Ed.2d 261, 279–280 (1977). To the extent that school employees can force boards to submit matters of educational policy to an arbitrator, the employees can distort the democratic process by increasing their influence at the expense of these other groups. As the Alaska Supreme Court wrote, *Kenai, supra*, 572 P.2d at 419:

"If teachers' unions are permitted to bargain on matters of educational policy, it is conceivable that through successive contracts the autonomy of the school boards could be severely eroded, and the effective control of educational policy shifted from the school boards to the teachers' union. Such a result could threaten the ability of elective government officials and appointive officers subject to their authority, in this case the school boards and admin-

istrators, to perform their functions in the broad public interest."

Under the State Board's balancing approach, however, § 6–408(b)(1) may not be construed to encompass matters that predominantly concern the determination of educational policy or the administration of the public schools. Matters of greatest importance to the community at large will be decided in the governmental arena, in which public employees can participate on an equal basis with other interested groups. On the other hand, matters of greatest direct importance to public employees will be subject to collective bargaining.

As we observed, in *Hubbard, supra,* 305 Md. at 792, 506 A.2d at 633–634, the line between educational policy matters and matters subject to collective bargaining will be "elusive in many contexts." In fact, courts have noted the necessarily ad hoc nature of such determinations. *Kenai, supra,* 572 P.2d at 422; *Pennsylvania L. R. Bd. v. State Col. A.S.D., supra,* 461 Pa. at 500, 337 A.2d at 265; *Beloit Educ. Ass'n v. WERC, supra,* 73 Wis.2d at 55, 242 N.W.2d at 236. Consequently, application of the State Board's expertise is extremely important. Unless it is demonstrated in a particular case that the line drawn by the State Board under § 6–408(b)(1) is arbitrary, or clearly in violation of the Education Article, or otherwise contrary to law, the State Board's determination will normally be controlling.

### V.

We now consider, in light of the above discussed principles, the matters at issue in this case, namely the school calendar and job reclassification decisions.

### A.

As previously noted, *supra* n. 1, the school calendar sets the beginning and end of the school year, and the days on which schools are open for instructional purposes. In establishing the school calendar, however, the County

Board does not unilaterally determine the number of days, etc., that schools should be open. For example, § 7–103(a) of the Education Article prescribes the minimum number of days and hours for the school year, sets forth a 10–month period for the year, deals with Saturdays, Sundays, and holidays, etc.

In Opinion 70–1, the State Board held that the calendar was "non-negotiable," reasoning that the calendar affected not only the union members in the case before it, but also all other school employees, and the community at large. According to the State Board, the interest of the latter groups must "weigh heavily"; therefore, the State Board concluded that the makeup of the school calendar fell "within the prerogative of the local board."

The Hearing Examiner's opinion in this case echoes the reasoning of Opinion 70–1. She stated (3 Opinions of the Md. State Bd. of Educ. at 613–614):

"The County Board must harmonize the interests of three employee unions and the need for parents and students to be informed of the school calendar in advance in order to plan their schedules. If the school calendar was deemed negotiable and if an agreement could not be reached between the union and the County Board, it is very likely that Section 6–408(d) impasse procedures would be time-consuming with the school calendar remaining unscheduled to the detriment of members of the community."

The Hearing Examiner conceded that some decisions from other jurisdictions have held that school boards may agree to negotiate the school calendar. *See, e.g., Beloit Educ. Ass'n v. WERC, supra,* 73 Wis.2d at 62, 242 N.W.2d at 240; *Westwood Community Schools,* 1972 MERC Lab.Op. 313 (Mich.1972). She appeared to recognize, however, that these cases arose under statutory schemes different from Maryland's. 3 Opinions of the Md. State Bd. of Educ. at 612. Moreover, she expressly rejected the reasoning of the *Westwood* case, in which a public employment commission had reached the conclusion that a teacher's

interest in planning summer activities outweighs the interests of parents, students, and other school employees.

On the calendar issue, the State Board completely accepted the Hearing Examiner's findings and conclusions. We hold that the State Board's decision was justified.

Opinion 70-1 and the Hearing Examiner's opinion in this case exemplify the process of balancing the interests of individual employees against the interests of the community at large. The testimony before the Hearing Examiner demonstrates that employees are, at most, inconvenienced by the County Board's refusal to negotiate the school calendar.[5] Thus, the Hearing Examiner concluded that the employees' interests were slight when weighed against the interests of parents, students, other employees, and the smooth operation of the school system. *See* 3 Opinions of the Md. State Bd. of Educ. at 613–614. A majority of state courts have reached a similar conclusion. *See, e.g., NEA–Kansas City v. U.S.D. No. 500,* 227 Kan. 541, 543, 608 P.2d 415, 418 (1980); *Committee of Burlington v. Burlington Educators Ass'n,* 7 Mass.App. 41, 385 N.E.2d 1014, 1017 (1979); *Bd. Ed. W'dst'n–Pilesgr. Sch. v. W'dst'n–Pilesgr. Ed. Ass'n.,* 81 N.J. 582, 592, 410 A.2d 1131, 1136 (1980); *Eugene Ed. Assn. v. Eugene Sch. Dist.,* 46 Or.App. 733, 740, 613 P.2d 79, 83 (1980); *see also City of Biddeford v. Biddeford Teachers Ass'n,* 304 A.2d 387 (Me.1973).

### B.

■ Reclassification, as noted earlier, *supra* n. 1, is the process of reassessing a classified employee's duties and responsibilities in order to assign a new classification or

---

5. In explaining his contention that the County Board's refusal to negotiate had a severe impact on MCEA employees, Mr. Walter Rogowski, MCEA's Executive Director, testified:

"We had lost a day in which teachers had historically been provided the opportunity to attend the M.S.T.A. convention.... We had found ourselves returning to school at the end of a school year on a Monday, to conclude the school year, thereby losing an entire weekend if people wanted to leave."

status to the employee's position. The classification system involved in this case has four classifications or "salary lanes," each of which contains ten grade steps reflecting length of service. The County Board negotiates the salary for each classification and grade step.

Reclassification is a continuous process, which sometimes requires administrators to move employees from one classification to another while a collective bargaining agreement is in effect. This movement may result in an increase or a reduction of the affected employee's salary.

In Opinion 70–1, the State Board held that job reclassification decisions, considered independently of their salary impact, were "non-negotiable." In reaching its decision, the State Board reasoned that the General Assembly had implicitly granted local boards the sole power to make such decisions.[6]

MCEA attempted to distinguish Opinion 70–1 in this case, asserting that only the salary impact of reclassification decisions, not the decisions themselves, should be subject to collective bargaining. Unlike the State Board in Opinion 70–1, the Hearing Examiner found the applicable Code provisions inconclusive. Thus, she proceeded to assess the consequences of requiring the State Board to negotiate this matter.

The Hearing Examiner found that the tasks of reevaluating duties and reevaluating salaries were "inextricably intertwined." 3 Opinions of the Md. State Bd. of Educ. at

---

6. The State Board observed that Maryland Code (1957, 1969 Repl. Vol.), Art. 77, § 68(a) (currently § 6–201(b) of the Education Article), gave the county superintendent the right to nominate, for appointment by the local board of education "all professional assistants of the office." In addition, the State Board pointed out that, when read together, Art. 77, § 68(b) (currently § 6–201(d)) and Art. 77, § 54 (currently § 4–103), authorized the local board to appoint supervisory personnel on the county superintendent's recommendation. The State Board then asserted that the right of appointment included the right of reclassification. Because by statute the right of appointment rested in the local board's complete control, the State Board held reclassification decisions nonnegotiable.

615. Therefore, she concluded that "the salary determination incident to the reclassification process is a management prerogative," which ought to remain in the hands of persons able "to see the system and its needs as a whole." *Id.* at 616. The Hearing Examiner found that giving public employees the right to negotiate such decisions would threaten the integrity of the reclassification process as a management function. Each of the several unions that negotiate with a local board could demand the right to negotiate reclassification salary changes as they occur. Because reclassification is an ongoing process, and because the Hearing Examiner found that each of the County Board's three unions would have the right to negotiate reclassification studies, she foresaw constant negotiations creating chaos in the management function.

The State Board employed the Hearing Examiner's findings and conclusions to reaffirm Opinion 70–1. In our view, MCEA has not demonstrated that the State Board's conclusion was arbitrary or clearly contrary to the Education Article or otherwise in violation of law.

This issue is more difficult to resolve than the school calendar issue. The salary impact of reclassification decisions appears to relate directly to "salaries" or "wages." Moreover, individual reclassifications may have a particularly severe impact on affected employees. Furthermore, the employees' decision to enter into a collective bargaining agreement entails certain assumptions as to salary lanes and grade levels. Unilateral reclassifications may frustrate those assumptions.

Although the impact of reclassification decisions upon individual employees may be significant, there was record support for the Hearing Examiner's conclusion that submitting such decisions to collective bargaining would have a serious adverse impact on the County Board's ability to

operate its school system.[7] We are not persuaded that the State Board's application of § 6–408(b)(1) to the reclassification issue was impermissible as a matter of law.[8]

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. PETITIONER TO PAY COSTS.

---

**7.** The Hearing Examiner relied on County Board witnesses who testified that, if reclassification decisions were negotiable, all three unions of County Board employees would demand the right to negotiate such decisions as they occur. The witnesses also testified that constant negotiations concerning salary reclassification would have a detrimental effect on the County Board's ability to manage the school system. In addition, the Hearing Examiner expressly credited the testimony of Robert J. Cooney, the County Board's Director of Association Relations. According to Mr. Cooney, if reclassification decisions were negotiable, MCEA would have the prerogative to initiate salary studies. Mr. Cooney also stated: "I just see it as a chaotic situation, it doesn't lend itself to bargaining, because, bargaining is what do you trade for what, and I don't believe classification or reclassification in any system, including a merit system, should be bargained or traded."

**8.** At oral argument, counsel for the County Board conceded that the dispute provisions of a collective bargaining agreement would prevent a local board from jettisoning bargained-for wage scales under the guise of reclassification. In such a case, an arbitrator could determine whether the local board had undertaken the reclassification in good faith.