704 A.2d 981

PISCATAWAY TOWNSHIP EDUCATION ASSOCIATION,
APPELLANT, v. PISCATAWAY TOWNSHIP BOARD
OF EDUCATION, RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted November 18, 1997—Decided January 14, 1998.

Before Judges LONG, STERN and KLEINER.

*Klausner & Hunter,* attorneys for appellant (*Stephen E. Klausner,* of counsel and on the brief).

*David B. Rubin,* attorney for respondent.

*Robert E. Anderson,* General Counsel, Public Employment Relations Commission (*Mr. Anderson,* of counsel and on the brief).

The opinion of the court was delivered by

LONG, P.J.A.D.

On this appeal, the Piscataway Township Education Association (Association) challenges a determination of the Public Employment Relations Commission (PERC) dismissing the unfair practice charge the Association filed against the Piscataway Township Board of Education (Board). In its charge, the Association alleged that the Board violated the Employer–Employee Relations Act, *N.J.S.A.* 34:13A–1 *et seq.,* when it did not negotiate with the Association over changes in the school calendar and over the impact of those changes on Board employees.

The law governing the question of the need to negotiate a change in the school calendar is clear. Such a change is a managerial prerogative of the school administration which cannot be bargained away. As such, it need not be negotiated. *Burlington Cty. College Faculty Ass'n v. Bd. of Trustees,* 64 *N.J.* 10, 311 *A.*2d 733 (1973). The law governing the question of whether the impact of such a calendar change on the work and welfare of public employees needs to be negotiated is equally clear, although widely misunderstood. In this opinion, we will endeavor to resolve this misunderstanding which has arisen out of misplaced reliance on our unreported opinion in *Edison Tp. Bd. of Ed. v. Edison Tp. Ed. Ass'n,* App. Div. Dkt. No. A–5164–77 (9/21/79) which held that impact issues related to a managerial prerogative are non-negotiable. In fact, in *Bd. of Ed. of Woodstown–Pilesgrove v. Woodstown–Pilesgrove Ed. Ass'n,* 81 *N.J.* 582, 410 *A.*2d 1131 (1980) the Supreme Court rejected this rule and declared that terms and conditions of employment arising as impact issues are indeed mandatorily negotiable unless negotiations would significantly interfere with the exercise of the related prerogative. We reiterate that holding here and conclude that in light of *Woodstown–Pilesgrove* our opinion in *Edison Tp.* should not be followed.

*I*

The facts underlying the unfair practice charge are basically undisputed.[1] The Board and Association were parties to a 1992–95 collective agreement which contained the following School Calendar clause in Article 17:

SCHOOL CALENDAR

The Superintendent shall prepare the annual school calendar consistent with *N.J.S.A.* 18A–25.3 and other pertinent regulations of the State Board of Education. The Superintendent shall meet and confer with the representative of the Association to discuss distribution of holidays.

*Work Year*

The total in-school work year for teachers shall not exceed one hundred eighty-six (186) scheduled work days which shall be reduced by emergency closing except that teachers may be required to report for work during unscheduled emergency closing resulting from student disruptions or situations which require the participation of teachers in the solution, problems or planning of procedures dealing with the emergency.

*State Aid*

In the event of any emergency, or unusual reason notwithstanding anything contained in the Article to the contrary, the Board may require a teacher to work *in order to meet the minimum requirements of the law to receive state aid.*

The original 1993–94 school calendar included 186 work days for teachers. There were 20 scheduled work days in January with January 17 scheduled off for the Martin Luther King holiday; 18 scheduled work days in February with February 18 and 21 scheduled off for mid-winter recess; 19 scheduled work days in March with March 28, 29, 30 and 31 scheduled off for spring recess; 19 scheduled work days in April with April 1 and 4 scheduled off for spring recess; 21 scheduled work days in May with May 30 scheduled off for Memorial Day; and, 14 scheduled work days in June with the last work day scheduled for Monday, June 20. After June 20, there were eight more weekdays remaining in June. A statement at the bottom of the calendar provided that: "If schools are closed for inclement weather, make-up sessions will begin on June 21st and continue as needed." Three

---

[1] These are the facts as found by the hearing examiner.

inclement weather work days had already been included in the calendar.

The winter of 1993–94 was extremely harsh. The Piscataway schools were closed a total of twelve days. There were eight snow days in January 1994, three snow days in February, and one snow day in March. Although three snow days had been built into the calendar, the Board still needed to make up 9 days.

During January 1994, as more and more school days were being lost to weather emergencies, Superintendent Philip Geiger, Director of Personnel Gordon Moore, and others, were discussing how to make up the lost school days. They considered extending school beyond the June 20th closing date but there were several problems with that option. First, there were only eight days available in June and it might not be enough time if more snow days were taken in late January, February, or March. Second, graduation had to be scheduled in June well in advance to allow for adequate planning. Third, many parents and other citizens opposed extending school to the end of June. Fourth, the schools were not air-conditioned and there could be many hot days in late June. The Superintendent also considered using some of the mid-winter and spring recess days as make-up days.

By January 28, 1994, the Board had already lost eight days due to snow and ice. On that date, Superintendent Geiger sent a letter to parents and guardians indicating that the last five days had to be made up. He indicated he would recommend the Board eliminate school holidays scheduled for February 18 and 21, and April 4, and use those days as make-up days, with additional make-up days to be added to the end of the school year. He noted that his recommendation had been developed in consultation with the leaders of the Districts' parent organizations, but he invited additional input be provided to the Board.

That same day, Geiger sent a copy of this letter to the faculty and staff members. He advised the employees of his recommendation but asked for their thoughts. He was interested in knowing whether his recommendation would cause anyone "irreparable

harm." He noted that if the three holiday days were used, the two remaining days (of the original five days that needed to be made up) would be added at the end of the year.

Association President Giovanne Musto received this information about the time it issued, but neither Superintendent Geiger, nor any Board member, contacted, discussed or negotiated with the Association over the scheduling of the make-up days.

A Board meeting was held on Wednesday, February 2, 1994, at which the make-up days and school calendar changes were discussed and decided. Association President Musto was aware that Geiger's recommendation on make-up days would be considered at that meeting, but Musto did not make a demand to negotiate over the make-up days prior to that meeting.

At the meeting, the Board broadened Geiger's recommendation and decided to open school on February 18 and 21; March 28, 29 and 30; and April 4 as make-up days. Geiger informed all the employees of the Board's decision by letter of February 4, 1994. Geiger also advised the employees that those who would suffer "severe consequences" would be given special consideration to use personal or unpaid leave. Office, custodial and maintenance employees were told that in place of April 4, they would be given another floating holiday. Finally, Geiger advised the employees that if no other school days were lost, school could end on June 17, instead of June 20, because of the three snow days built into the schedule. The Board did not negotiate with the Association over the calendar changes, or over the impact of the changes on unit members.

Pursuant to Geiger's offer to consider special personal leave circumstances during the previously scheduled mid-winter or spring recesses, several requests were approved for vacations and use of personal leave. They included situations where tickets could not be refunded, and where leave without pay was granted. The Board did not negotiate with the Association over the decision to grant the special requests.

On February 8, 1994, Geiger sent a letter to parents and guardians informing them of the Board's decision to conduct school on February 18 and 21, March 28, 29 and 30, and April 4 as make-up days.

In a February 14, 1994 letter to the Board, Musto, on behalf of the Association, made a demand to negotiate the impact of the calendar changes on Association membership. Musto noted that the calendar changes were made without consultation with the Association; constituted a change in terms and conditions of employment; and would cause financial loss to some individuals. The Board neither negotiated, met, nor conferred with Musto regarding the changes.

On February 18, 1994, Geiger wrote Musto informing him that the Board was not required to negotiate over the make-up day scheduling, but he offered to informally discuss the matter.

After the last snow day on March 3, 1994, the Board developed a revised 1993–94 calendar for the remainder of that school year. It reflected the days that had been scheduled as make-up days which included February 18 and 21; March 28, 29 and 30; April 4; and, June 21, 22 and 23, 1994. The three snow days built into the original schedule were not made up, thus, the final number of teacher work days was 183, not 186.

On these facts, a hearing examiner recommended that the complaint be dismissed. He concluded that the Board had a contractual right to reschedule the school days. Relying on our unpublished opinion in *Edison Tp. Bd. of Ed. v. Edison Tp. Ed. Ass'n*, App. Div. Dkt. No. A–5164–77 (9/21/79), *NJPER Supp.*2d 66 (¶ 47 App. Div.1979), *certif. denied*, 82 *N.J.* 274, 412 *A.*2d 780 (1979) and on *Middletown Tp. Bd. of Ed.*, P.E.R.C. No. 96–30, 21 *NJPER* 392 (¶ 26241 1995), he also concluded that the Board did not have a duty to negotiate over any impact issues. The Association did not file exceptions and PERC chose not to review the case. Thus, the hearing examiner's report became final under *N.J.A.C.* 19:14–8.2. The Association appeals, contending that the Board had no right to amend the school calendar without negotia-

tion and that, in any event, the Board erred in refusing to negotiate the impact of the change in the calendar.

## II

The resolution of the first issue is relatively straightforward. *N.J.S.A.* 34:13A–5.3 entitles public employees in an appropriate negotiations unit to select a majority representative to negotiate over their "terms and conditions of employment." *See D'Arrigo v. New Jersey State Bd. of Mediation,* 119 *N.J.* 74, 78, 574 *A.*2d 44 (1990); *Lullo v. IAFF,* 55 *N.J.* 409, 426, 262 *A.*2d 681 (1970). However, it is well-established that the establishment of a school calendar is not a "term and condition of employment" but a "major educational determination which traditionally has been the exclusive responsibility" of school administrations. *Burlington Cty. College Faculty Ass'n v. Bd. of Trustees,* 64 *N.J.* 10, 311 *A.*2d 733 (1973). The Board thus did not have to negotiate with the Association before deciding[2] to open schools on days previously scheduled as recess days.

## III

As we have indicated, the impact issue is more complicated, procedurally as well as substantively. It is a procedural oddity in that the position advanced by PERC in its appellate brief, written at our request after initial submission, is contrary to the position the agency has taken in similar cases in the past, and to the result reached in this case. Presumably the brief was filed with PERC's approval and we accept the argument set forth therein as the position of that agency. The anomaly is that our adoption of the

---

[2] *Burlington* also holds that the days of work of individual teachers are mandatorily negotiable, provided the negotiations are conducted in light of the school calendar. *Id.* at 12, 311 *A.*2d 733. Given that boards must offer at least 180 days of instruction each year, the Commission has limited negotiations over teacher work year to those days exceeding that minimum. *Edison Tp. Bd. of Ed.,* P.E.R.C. No. 78–53, 4 *NJPER* 151 (¶ 4070 1978).

legal position in PERC's brief will result in a reversal of its order on appeal.

 Substantively, some background is in order. The 1968 Act required negotiations over "terms and conditions of employment." *N.J.S.A.* 34:13A–5.3. This phrase was not defined, but the 1973 *Dunellen* trilogy supplied this negotiability test: mandatorily negotiable subjects intimately and directly affect the employees' work and welfare, but do not significantly interfere with the employer's educational responsibilities. *Englewood Bd. of Ed. v. Englewood Teachers Ass'n,* 64 *N.J.* 1, 7, 311 *A.2d* 729 (1973); *Burlington Cty. College Faculty Ass'n v. Bd. of Trustees,* 64 *N.J.* 10, 14, 311 *A.2d* 733 (1973); *Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n,* 64 *N.J.* 17, 25, 311 *A.2d* 737 (1973). Such subjects as compensation, work hours, work loads, and personal and other leaves of absence are considered to be "terms and conditions of employment" under that test. *Englewood* at 8–9, 311 A.2d 729; *Burlington* at 14, 311 A.2d 733.

In 1974, the Legislature empowered PERC to make scope of negotiations determinations. *N.J.S.A.* 34:13A–5.4(d). The amendment did not affect the continuing viability of *Dunellen's* negotiability test. *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.,* 78 *N.J.* 144, 156, 393 *A.2d* 278 (1978); *In re Byram Tp. Bd. of Ed.,* 152 *N.J.Super.* 12, 22, 377 *A.2d* 745 (App.Div.1977). In exercising its new jurisdiction, PERC distinguished between non-negotiable decisions and negotiable impact issues involving terms and conditions of employment. In *Rutgers, The State Univ.,* P.E.R.C. No. 76–13, 2 *NJPER* 13, 15–16 (1976), PERC stated:

> In this regard a distinction must be drawn between a public employer's activities concerning terms and conditions of employment, and ... a public employer's activities concerning matters other than terms and conditions of employment, but having an effect or impact on terms and conditions of employment. In the first instance, the employer's activities deal with terms and conditions of employment and thus are subject to the negotiations obligations indicated above. An obvious example would be an employer's proposal to increase or decrease salaries. As the proposal concerns a term and condition of employment, it may not be effectuated unilaterally.

In the second instance, the employer's activities deal with matters other than terms and conditions of employment and may therefore be undertaken unilaterally, except that the resultant impact on terms and conditions of employment is subject to the negotiations obligations. An example would be a private employer's decision to manufacture an additional product line, creating a need to purchase new manufacturing equipment and to hire new unit employees. The managerial decision may be undertaken unilaterally, but the wages, hours, fringe benefits, etc. of the new unit employees—terms and conditions of employment—may not be effectuated unilaterally. [Footnote omitted]

Similarly, in *Maywood Bd. of Ed.*, H.E. No. 78–1, 3 *NJPER* 244 (1977), a PERC Hearing Examiner applied the decision/impact dichotomy. He held that negotiations were not required over a decision to reduce the work force, but were required over the effect of that reduction on a librarian who had been laid off and on retained teachers whose workload and pupil contact time had been increased. PERC adopted these rulings. P.E.R.C. No. 78–23, 3 *NJPER* 377 (1977).

On appeal, the employer contested the impact rulings and we reversed. *In re Maywood Bd. of Ed.*, 168 *N.J.Super.* 45, 401 *A.*2d 711 (App.Div.) *certif. denied*, 81 *N.J.* 292, 405 *A.*2d 836 (1979). With respect to both the librarian who had been laid off and the impact of the reduction in force on the retained teachers whose workload and pupil contact time had been increased because of the layoffs, we ruled that there could not be negotiations given the employer's prerogative to lay off employees. *Id.* at 55, 401 *A.*2d 711.

These basic rulings in *Maywood* fully conformed with PERC's previously expressed views in *Rutgers*. The essence of *Maywood* was that no issues were raised that could be negotiated without frustrating the employer's prerogative to reduce its work force. Inexplicably, the *Maywood* panel went a step further and appeared to reject the negotiability of impact issues altogether in the absence of a legislatively established permissive negotiations category. *Id.* at 56–58, 401 *A.*2d 711. *See Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144, 393 *A.*2d 278 (1978). However, PERC had never premised its previous impact rulings on the existence of a permissive category but had directly held

that the impact of changes in the terms and conditions of employment such as compensation, workload, work hours, and leaves is a mandatorily negotiable term or condition of employment. *See e.g., Rutgers, supra. See also Burke v. Bowen,* 49 *A.D.*2d 904, 373 *N.Y.S.*2d387 (N.Y.A.D.1975), *aff'd* 40 *N.Y.*2d 264, 386 *N.Y.S.*2d 654, 353 *N.E.*2d 567 (1976) *cited in Maywood* (the impact of an employer's decision to lay off firefighters is mandatorily negotiable).

This brings us to *Edison Tp. Bd. of Ed. v. Edison Tp. Ed. Ass'n, supra.* In that case, the teachers' representative filed an unfair practice charge against the Board for canceling, without negotiations, a holiday and part of spring break to make up for snow days. PERC dismissed this charge, concluding that the board had a prerogative to reschedule work days to ensure 180 days of instruction. *Edison Tp. Bd. of Ed.,* P.E.R.C. No. 78–53, 4 *NJPER* 151 (¶ 4070 1978). However, the last paragraph of its opinion distinguished the non-negotiability of that decision from the negotiability of the detrimental effects (impact) upon employees:

> [T]he Association set forth several examples of the detrimental effects on the teachers' personal and financial welfare. These effects, such as lost employment opportunities, trip deposits, and altered family holiday plans were all alleged to be the result of the rescheduling of school days into what had previously been scheduled to be non-school days. While it is our understanding that this impact was not alleged as a separate unfair practice and thus does not alter our decision to dismiss the unfair practice charge which sought negotiation of the days themselves, we point out that these effects do constitute an impact on the employees which would require the Board to negotiate with the Association prior to the implementation of the alteration in the school calendar. Such negotiations need not, as stated above, involve the actual change in the days but rather would be limited to ways to ameliorate the effects of these changes on the employees. [Footnote omitted]

When the representative sought to negotiate over such issues, the board refused. The representative filed a second charge and asserted that teachers had been forced to cancel trips and lose non-refundable deposits or to use personal days to complete trips. PERC ordered the board to negotiate over these detrimental effects. *Edison Tp. Bd. of Ed.,* P.E.R.C. No. 79–1, 4 *NJPER* 302

(¶ 4152 1978). The school board appealed. In a per curiam opinion, we reversed the order to negotiate stating that:

> In essence respondents' theory is that even if the school calendar is nonnegotiable . . . , any "impact" upon the terms and conditions of the employment produced by a required rearrangement of that calendar must nonetheless be negotiated. We disagree. We are satisfied that the matter is controlled by the principles recently recognized in *In re Maywood Board of Education,* 168 *N.J.Super.* 45 [401 *A.*2d 711] (App.Div.1979), certif. den. 81 *N.J.* 292 [405 *A.*2d 836] (1979), with which principles this Part is in accord.
>
> [*Edison Tp. Bd. of Ed. v. Edison Tp. Ed. Ass'n,* App. Div. Dkt. No. A–5164–77 (9/21/79), *NJPER Supp.*2d 66 (¶ 47 App. Div.1979).]

Certification was denied and since 1979, *Edison Tp.* has been cited for the proposition that impact issues related to the exercise of a prerogative are non-negotiable. More particularly, *Edison Tp.* has been cited as precluding negotiation of the impact of calendar changes. *Middletown Tp. Bd. of Ed. v. Middletown Ed. Ass'n.,* P.E.R.C. No. 96–30, 21 *NJPER* 392 (¶ 26241 1995).

In 1980, however, the Supreme Court decided *Bd. of Ed. of Woodstown–Pilesgrove v. Woodstown–Pilesgrove Ed. Ass'n,* 81 *N.J.* 582, 410 *A.*2d 1131 (1980). There an employer exercised its prerogative to change the school calendar by adding two hours of instruction on the day before Thanksgiving. The teachers in turn sought payment for those additional work hours. We held that this compensation issue was mandatorily negotiable. *Bd. of Ed. of Woodstown–Pilesgrove v. Woodstown–Pilesgrove Ed. Ass'n,* 164 *N.J.Super.* 106, 395 *A.*2d 884 (App.Div.1978). The Supreme Court agreed. Rather than ending all further inquiry if an employer has acted pursuant to a prerogative, the Court stated that further analysis may be required when the impact of the exercise of a prerogative is involved. *Id.* at 588–89, 410 *A.*2d 1131. The Court thus rejected the suggestion that all impact issues related to a prerogative are necessarily non-negotiable. However, the Court also rejected the Commission's decision/impact dichotomy to the extent it had attempted "always" to reconcile managerial prerogatives and terms and conditions of employment by "isolating and focusing solely upon the impact or effect of a managerial decision . . . ." Believing that this approach would "frustrate preroga-

tives," the Court adopted a balancing test requiring that the "nature of the terms and conditions of employment must be considered in relation to the extent of their interference with managerial prerogatives." *Id.* at 589–91, 410 *A.*2d 1131. Under that test, "[w]hen the dominant issue is an educational goal, there is no obligation to negotiate and subject the matter, including its impact, to binding arbitration." *Id.* at 591, 410 *A.*2d 1131. But "[i]t is only when the result of bargaining may significantly or substantially encroach upon the management prerogative that the duty to bargain must give way to the more pervasive need of education policy decisions." *Id.* at 593, 410 *A.*2d 1131. Terms and conditions of employment arising as impact issues are thus mandatorily negotiable unless negotiations would significantly interfere with the related prerogative. In so holding, the Supreme Court essentially rejected the contrary approach articulated in *Maywood* and its progeny, namely, *Edison Tp.*

We recognized the import of *Woodstown–Pilesgrove* in *City of Elizabeth v. Elizabeth Fire Off.*, 198 *N.J.Super.* 382, 487 *A.*2d 337 (App.Div.1985). There, we agreed with PERC that an employer could require employees on sick leave to submit doctors' notes verifying their illness, and also that the impact issue of who pays for health examinations was severable and mandatorily negotiable:

> It is clear that the finding of a connection between a managerial prerogative and an issue sought to be negotiated does not automatically bar negotiability. Indeed nearly every determination by management in the public sector will, in some measure, implicate the governmental policy making function. It is for this reason that in *Local 195* the Supreme Court required the showing of a "significant" interference with managerial prerogative in order to preclude negotiation. 88 *N.J.* at 404 [443 *A.*2d 187]. The Court went on to explicate the significant interference concept this way:
>
>> To decide whether a negotiated agreement would significantly interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions. [88 *N.J.* at 404–405, 443 *A.*2d 187]
>
> We think that the commission struck the proper balance in this case. By holding that the city had a managerial prerogative to require sick leave verification at any time, the commission protected the governing body's interest in identifying and

dealing with sick leave abuse. By severing the question of who pays for the required doctors' reports, the commission protected the legitimate economic interests of employees in avoiding unnecessary financial obligations and in negotiating a full package of health care benefits. Together, these holdings accommodate the legitimate interests of management and labor without unduly interfering with managerial prerogative.

\* \* \* \*

We view the situation in this case as falling rather clearly within the reasoning expressed in *Woodstown–Pilesgrove.* The kinds of facts justifying a bar against negotiability as established in *Local 195* simply are not present here. Since we find no significant interference with the determination of governmental policy, there is no reason for us to interfere with a decision of the commission which we view as entirely correct.

[*Id.* at 386–388, 487 *A.*2d 337.]

*Woodstown–Pilesgrove* is equally applicable here. As such, the hearing examiner's decision, which ultimately became the decision of PERC, was wrong insofar as it determined as a matter of law that "the impact of required calendar changes necessitated by weather related closings is non-negotiable" under *Edison Tp.* In other words, the mere connection between the exercise of a managerial prerogative and the impact of that exercise on employees does not render the impact issue non-negotiable. In each case, a determination should be made under *Woodstown–Pilesgrove* whether negotiating the impact issue would significantly or substantially encroach upon the management prerogative. If the answer is yes, the duty to bargain must give way. If the answer is no, bargaining should be ordered.

Accordingly, we reverse and remand the case to PERC for reconsideration of the issues presented here in light of the legal standard to which we have adverted.