2002 SD 163

**WEST CENTRAL EDUCATION ASSOCIATION, Petitioner and Appellee,**

v.

**WEST CENTRAL SCHOOL DISTRICT 49–4 and Board of Education, Respondents and Appellants.**

**No. 22394.**

Supreme Court of South Dakota.

Argued Nov. 20, 2002.

Decided Dec. 23, 2002.

Anne Crowson Plooster, General Counsel, SDEA, Pierre, South Dakota, Attorney for petitioner and appellee.

Gerald L. Kaufman, Jr., Kaufman Law Office, Huron, South Dakota, Attorney for respondents and appellants.

ZINTER, Justice.

[¶ 1.] West Central Education Association (Association) filed an unfair labor practice complaint against the West Central School District and the West Central Board of Education (collectively referred to as School Board). It filed the complaint because the School Board refused to engage in collective bargaining with the Association over the school calendar. The Department of Labor (Department) found no unfair labor practice because it concluded that the school calendar was not a subject of mandatory negotiation. On appeal, the circuit court, the Honorable Richard Bogue, reversed the Department. The circuit court concluded that the school calendar was a mandatory subject of negotiation in public employee collective bargaining. We reverse the circuit court and affirm the Department.

### FACTS AND PROCEDURAL HISTORY

[¶ 2.] Prior to the 1988–89 school year, the school calendar [1] was negotiated at the bargaining table along with Association proposals regarding salary and other conditions of employment. Although there is some dispute about the matter, in 1988, it appears that the parties agreed to remove the calendar as a negotiable item from the bargaining table. Instead, they agreed to address the calendar through a calendar committee. The calendar committee considered the views of a number of groups including the Association. However, the School Board made the ultimate decision without collective bargaining.

[¶ 3.] By 1994, the School Board formally implemented a policy defining how it would determine the school calendar.

---

1. The hearing examiner found that West Central School District's school calendar indicates when the school year begins and ends, vacation dates and when parent-teacher conferences are held. Essentially, the school calendar 'spells out what the school year looks like.'

Although the 1994 written policy allowed input from the Association through the calendar committee, the policy did not require collective bargaining with the Association. The written policy provided:

1. The superintendent shall submit next year's calendar to the Board for Board consideration, changes and approval;

2. The Board will consider the recommendations of the Association concerning the starting and ending date for school, vacations and holidays, and student and teacher days;

. . . .

The Association did not file a grievance when this policy was adopted in 1994 or when it was amended in 1995.

[¶ 4.] However, in 1997, the Association informed the superintendent of the school that the Association would not participate on the calendar committee, "and [the Association] decided to have the calendar back in negotiations." Consequently, the Association refused to meet with the calendar committee and the superintendent for purposes of developing a proposed calendar to present to the School Board. At the same time, the School Board rejected the Association's demand to negotiate the calendar

because the School Board took the position that the calendar was not a mandatory subject of negotiation with teachers or their Association.

[¶ 5.] The School Board and Association did, however, engage in collective bargaining that year. The parties ultimately reached impasse on three issues, one of which was the negotiability of the calendar. Following mediation, the parties sought assistance from the Department in resolving the impasse under SDCL 60–10–2.[2] With respect to the school calendar, the Department recommended that the parties engage in collective bargaining. However, the School Board chose not to adopt the Department's recommendation.

[¶ 6.] Instead, the School Board refused to negotiate the calendar and it refused to impose calendar language in the contract. See SDCL 3–18–8.2.[3] The School Board refused to impose any language into the collective bargaining agreement regarding the calendar because the School Board took the position that its last proposal was that the calendar was not a mandatory subject of negotiation. The School Board believed that there was no reason to impose such contract language on a "non-negotiable item."

2. SDCL 60–10–2 provides:
   If its efforts as conciliator prove unsuccessful, the department of labor shall, if requested by either party, impartially investigate the matters in difference between the parties. The request to the department shall be mailed within twenty days after the conclusion of the conciliation procedure provided for in § 60–10–1. The department shall give each party ample opportunity for presentation of the facts and shall make a report of the issues involved and a recommendation for settlement of the controversy. . The department shall furnish a copy of its recommendation to each of the parties and to any local newspaper for publication for the information of the public.

3. SDCL 3–18–8.2 provides:

Any school district issuing contracts to teachers for the ensuing year, but prior to reaching agreement with the representatives of the recognized employee unit, shall issue the contracts under the same terms and conditions as for the current year. If no agreement is reached in negotiations and the intervention of the labor department under § 3–18–8.1 fails to bring about an agreement, the board shall implement, as a minimum, the provisions of its last offer, including tentative agreements. If the labor department is not requested to intervene under the provisions of § 3–18–8.1, the board shall implement the provisions of its last offer, including tentative agreements, eleven days after an impasse is declared.

[¶ 7.] As a result of the School Board's action, the Association filed an unfair labor practice complaint with the Department. The Association alleged that the School Board had committed an unfair labor practice when it declined to negotiate the school calendar. On administrative review, a hearing examiner concluded that the calendar was not a mandatory subject of negotiation, and therefore, the School Board did not commit an unfair labor practice by refusing to negotiate that subject.

[¶ 8.] The Association appealed the hearing examiner's decision to circuit court. Circuit Court Judge Richard Bogue reversed the hearing examiner. Judge Bogue concluded that the calendar was a mandatory subject of negotiation. Judge Bogue remanded the case to the hearing examiner to determine whether, in light of his ruling, the School Board had committed an unfair labor practice when it refused to negotiate the calendar.

[¶ 9.] On remand, the hearing examiner adopted Judge Bogue's ruling. However, the hearing examiner concluded that the School Board did not commit an unfair labor practice. The hearing examiner concluded that there was no unfair labor practice because she found that prior to Judge Bogue's decision, neither party knew[4] that the calendar was a mandatory subject of negotiation. The School Board appealed that decision to circuit court. Circuit

Court Judge William Srstka heard this appeal after remand. Judge Srstka concluded that the doctrine of the law of the case required that he follow Judge Bogue's ruling on the negotiability of the calendar. Consequently, Judge Srstka affirmed the hearing examiner. The School Board now appeals to this Court raising one issue:

**Whether the circuit court erred in holding that the school calendar is a mandatory subject of collective bargaining.**

## STANDARD OF REVIEW

[¶ 10.] Our standard of review for administrative appeals is well settled. The Court reviews agency findings in the same manner required of the circuit court when reviewing a decision from an administrative agency. This Court reviews findings of fact under the clearly erroneous standard, whereas questions of law are reviewed under the de novo standard. The issue on review [here] is a question of law, upon which we apply a de novo standard of review.

*O'Toole v. Board of Trustees of the South Dakota Retirement System*, 2002 SD 77, ¶ 9, 648 N.W.2d 342, 345 (internal citations omitted).

## DECISION

[¶ 11.] SDCL 3–18–2[5] gives public employees the right to join labor organiza-

---

4. The hearing examiner's reasoning on remand has not been presented as an issue in this appeal. We express no opinion on that reasoning.

5. SDCL 3–18–2 provides:
Public employees shall have the right to form and join labor or employee organizations, and shall have the right not to form and join such organizations. Public employees shall have the right to designate representatives for the purpose of meeting and negotiating with the governmental agency or representatives designated by it

with respect to grievance procedures and conditions of employment and after initial recognition by the employer, it shall be continuous until questioned by the governmental agency, labor or employee organization, or employees, pursuant to § 3–18–5. It is a Class 2 misdemeanor to discharge or otherwise discriminate against an employee for the exercise of such rights, and the governmental agency or its designated representatives shall be required to meet and negotiate with the representatives of the employees at reasonable times in connection with such grievance procedures and

tions. SDCL 3–18–2 also gives public employees the right to designate representatives for the purpose of meeting and negotiating conditions of employment. Those conditions of employment include "rates of pay, wages, hours of employment, or other conditions of employment." SDCL 3–18–3.[6]

[¶ 12.] However, these statutes do not give public employees the right to engage in negotiations over all issues relating to rates of pay, wages, hours and other conditions of employment. "[T]he state is different from a private employer inasmuch as it has the unique responsibility to make and implement public policy. Accordingly, the scope of negotiations in the public sector is more limited than in the private sector." *Rapid City Education Association v. Rapid City Area School District No. 51–4*, 376 N.W.2d 562, 564 (S.D.1985) (citing *In re Local 195, IFPTE, AFL–CIO v. State*, 88 N.J. 393, 443 A.2d 187, 191 (N.J.1982)).

[¶ 13.] Therefore, to determine whether any issue is mandatorily negotiable in public employment, one must not only determine whether the subject falls within SDCL 3–18–2 and SDCL 3–18–3, but also whether the issue is one properly

decided by the political process or by collective negotiations. *Rapid City*, 376 N.W.2d at 562. In making that determination, the interests of the parties must be balanced to decide whether negotiations will significantly impair the state's ability to make policy decisions.

The role of the courts in a scope of negotiations case is to determine, in light of the competing interests of the State and its employees, whether an issue is appropriately decided by the political process or by collective negotiations. In making this sensitive determination, the mere invocation of abstract categories like "terms and conditions of employment" and "managerial prerogatives" is not helpful. To determine whether a subject is negotiable, the Court must balance the competing interests by considering the extent to which collective negotiations will impair the determination of governmental policy.

*Rapid City*, 376 N.W.2d at 564 (quoting *IFPTE*, 443 A.2d at 191).

[¶ 14.] To assist in making that sensitive determination, a three-part test is applied.

---

6. conditions of employment. The negotiations by the governmental agency or its designated representatives and the employee organization or its designated representatives shall be conducted in good faith. Such obligation does not compel either party to agree to a proposal or require the making of a concession but shall require a statement of rationale for any position taken by either party in negotiations. It shall be unlawful for any person or group of persons, either directly or indirectly to intimidate or coerce any public employee to join, or refrain from joining, a labor or employee organization.

6. SDCL 3–18–3 provides:
   Representatives designated or selected for the purpose of formal representation by the

majority of the employees in a unit appropriate for such purposes shall be the exclusive representatives of all employees in such unit for the purpose of representation in respect to rates of pay, wages, hours of employment, or other conditions of employment; provided that any individual employee, or a group of employees, shall have the right at any time to present grievances to their employer and to have such grievances adjusted without the intervention of the formal representative as long as the adjustment is not inconsistent with the terms of any settlement with the formal representative then in effect, and provided that the formal representative has been given opportunity to be present at such adjustment.

1. A subject is negotiable only if it intimately and directly affects the work and welfare of public employees.

2. An item is not negotiable if it has been preempted by statute or regulation.

3. A topic that affects the work and welfare of public employees is negotiable only if it is a matter on which negotiated agreement would not significantly interfere with the exercise of inherent management prerogatives pertaining to the determination of governmental policy.

*Id.* (citing *IFPTE*, 443 A.2d at 190–191).

[¶ 15.] School Board concedes that the school calendar is a subject that "intimately and directly affects the work and welfare of public employees" under part one of the test. Because we conclude that requiring a school board to negotiate its school calendar would significantly interfere with the exercise of inherent management prerogatives under part three, we

proceed to examine that test, and we need not consider whether the subject has been preempted by statute or regulation under part two.

[¶ 16.] In analyzing the question of management prerogative, it must first be remembered that SDConst art VIII, § 1 imposes a duty upon the Legislature to "establish and maintain" the public school system "and to adopt all suitable means to secure to the people the advantages and opportunities of education." *Id.* Therefore, there can be no question that the establishment and operation of schools implicates an important government policy. Moreover, that government policy is carried out in each school by local school boards because the Legislature has delegated to them the duty to establish the government's school policy in each school district. That delegation not only includes the government's general duty to operate and manage the schools,[7] but also, much of the responsibility to develop the school's policy on the calendar. *See*, SDCL 13–26–1; 13–26–2.[8] It is also significant that

---

7. SDCL 13–8–1 provides:

The school board is an elected body created according to the laws of the state to serve as the governing board of a school district for the purpose of organizing, maintaining, and locating schools and for providing educational opportunities and services for all citizens residing within the school district.

SDCL 13–8–39 provides:

As provided and limited by law, the school board has general charge, direction and management of the schools of the district and control and care of all property belonging to it. The school board may levy taxes, borrow money, employ any necessary personnel, lease real and personal property, carry liability and other insurance, or in lieu of insurance, make other arrangements, including entering into agreements with others, which agreements may create separate legal or administrative entities pursuant to chapter 1–24, to protect and assist the school board in meeting obligations arising from such acts or omissions for which the school board may be

legally liable, purchase all necessary books and equipment, purchase real property and erect necessary buildings for the operation of such schools.

8. SDCL 13–26–1 provides:

The school fiscal year shall begin July first and end June thirtieth. Each local school board shall set the number of days in a school term, the length of a school day, and the number of school days in a school week. The local school board or governing body shall establish the number of hours in the school term for kindergarten programs. The Board of Education shall promulgate rules pursuant to chapter 1–26 setting the minimum number of hours in the school term for grades one through three. The number of hours in the school term for grades four through twelve may not be less than nine hundred sixty-two and one-half hours, exclusive of intermissions. An intermission is the time when pupils are at recess or lunch.

SDCL 13–26–2 provides:

through elections, these school boards are the peoples' voice in determining the government's school policy. Considering these school board responsibilities, the question then is whether collectively bargaining over the school calendar significantly interferes with this School Board's management prerogatives pertaining to the determination of the government's school policy.

[¶ 17.] We have not had occasion to decide this issue. However, most other jurisdictions that have addressed the issue conclude that the interference with management prerogative is sufficient to make the school calendar a non-mandatory subject of negotiation.[9] For example, the New Jersey Supreme Court, the Court upon which the three-part *Rapid City* test is based, holds that the school calendar is not a mandatory subject of negotiation. *Piscataway Township Education Association v. Piscataway Township Board of Education*, 307 N.J.Super. 263, 704 A.2d 981, 982 (1998); *IFPTE*, 443 A.2d at 196; *In re Burlington County College Faculty Association v. Board of Trustees*, 64 N.J. 10, 311 A.2d 733, 736 (N.J.1973). The New Jersey Court stated:

> We firmly believe that when school begins, when it ends, when the buildings are opened, when children shall be admitted and when holidays occur are matters of inherent managerial policy ... and under no circumstances should be made items of collective bargaining.

*Id.* This is because "the right to determine what work will be done, and by whom and when it is to be done, is at the very core of successful management of the employer's business." *West Point Elementary School Teachers Ass'n v. Federal Labor Relations Authority*, 855 F.2d 936, 942 (2d Cir.1988) (further citations omitted). This holding has also been supported because:

> [T]he commencement and termination of the school year and the scheduling and

---

The school board or governing body shall operate grades one through twelve in its schools for at least a nine-month regular term in any one school year. The regular school term may be conducted on a year-round basis and shall begin on a date established by the school board. The Board of Education shall promulgate rules pursuant to chapter 1–26 governing the operation and scheduling of year-round schools. Any school board or governing body may release graduating high school seniors from school before the end of the regular term if the release is for no more than three school days. Make up time for school closing because of weather, disease, or emergency need not exceed ten school days. Graduating seniors are excused from make up time if the make up time occurs after the students have graduated or after graduation exercises have been held. If classes have been convened and then are dismissed, or if classes convene at a time later in the day than normal, because of inclement weather, that day constitutes a school day in session equal to the number of hours planned for that day as established in the local school district calendar for the year.

School boards are encouraged to provide time within the regular school term for curriculum and staff development, which shall be in addition to the time required in this section. Each school board shall determine the appropriate amount of time for this activity and how best to use the time based on local needs for program development, increased parent participation, student contact, teachers' preparation, or other needs of the schools in the district. School shall be in session only when classes are held and as provided in §§ 13–26–4 and 13–26–4.1. A school board may operate a special term during the summer months.

9. Association has placed great weight on a March 3, 1980 Memorandum Opinion of the Department of Labor, and South Dakota Attorney General's Opinion 72–10. Both opinions conclude that the school calendar is a subject of mandatory negotiation. However, neither opinion addressed whether collective bargaining over the school calendar significantly interfere[d] with the exercise of inherent management prerogatives as now required by *Rapid City*, 376 N.W.2d at 564. Therefore those opinions are inapposite.

length of intermediate vacation during the school year, at least insofar as students and teachers are congruently involved, [are] matters of 'educational policies' bearing too substantially upon too many and important non-teacher interests to be settled by collective bargaining. . . .

*Burlington*, 311 A.2d at 736 (quoting *City of Biddeford v. Biddeford Teachers Association*, 304 A.2d 387, 421 (Me.1973)). Indeed, as the parties here have noted, the school calendar not only effects teachers, but also the other school employees, students, parents, taxpayers, other school districts and cooperatives providing joint programs and activities, and in some cases, the entire community. Therefore, the school calendar is a matter of general public interest that requires basic judgments about how the government should best educate the state's children. Yet, as Association conceded at oral argument, were we to adopt its position, none of these vitally interested parties have any right to participate in the collective bargaining process that the Association wants to utilize to determine the school calendar.[10]

[¶ 18.] Because of all of these concerns, most courts hold that the school calendar is an inherently managerial subject that is not a mandatory topic of negotiation. The Minnesota Supreme Court held that the adoption of a school calendar is comparable to a manager setting up a work schedule.

When the school year begins and ends is comparable to when a work day begins and ends. The decision is made by management and controlled by the objectives and goals of the particular institution. Although employees are entitled to negotiate the number of hours worked, it does not follow that employees can negotiate *when* an employer deems it necessary to report to work. To allow employees to negotiate such a policy would involve negotiation of the actual objectives and goals of an employer.

*University Education Association v. Regents of the University of Minnesota*, 353 N.W.2d 534, 542 (Minn.1984) (emphasis in original). *See also, Kenai Peninsula Borough School Dist. v. Kenai Education Association*, 572 P.2d 416 (Alaska1977) (held, school calendar non-negotiable); *West Hartford Ed. Ass'n v. Dayson DeCourcy*, 162 Conn. 566, 295 A.2d 526 (1972) (held, school calendar was not mandatory subject of negotiation); *Indiana Educ. Employment Relations Bd. v. Highland*, 546 N.E.2d 101 (Ind.Ct.App. 1989) (held, calendar items were part of school board's exclusive managerial power, therefore, calendar was not subject of mandatory collective bargaining); *Montgomery County Educ. Ass'n, Inc. v. Board of Educ.*, 311 Md. 303, 534 A.2d 980 (1987) (held, school calendar was not subject of mandatory collective bargaining).

[¶ 19.] Association, however, argues that negotiations in this area would not create a substantial interference with a school board's inherent management prerogatives because a school board can by statute impose its "last best offer" after negotiations and therefore, the school board has the final say in these matters.[11] However, if this argument were adopted, it would mean that *all* issues between a school board and its teachers, including

---

**10.** It is of some interest that the Association even complains in its unfair labor practice petition that the School Board sought input on the calendar from volunteers and teachers who were not Association members.

**11.** See note 3, *supra.*

those expressly exempted from any collective bargaining by *Rapid City,* 376 N.W.2d 562, would nevertheless require negotiation simply because the school board has the final say after negotiations. That result is contrary to *Rapid City and Webster Education Association v. Webster School District,* 2001 SD 94, 631 N.W.2d 202.[12] Although, we acknowledge that SDCL ch 3–18 gives teachers the right to engage in collective bargaining over certain conditions of employment, the *Rapid City* and *Webster* three-part test clearly limits the subjects that are mandatorily negotiable under SDCL ch 3–18. *Rapid City,* 376 N.W.2d at 565; *Webster,* 2001 SD 94, ¶ 11, 631 N.W.2d at 206. Those cases determine whether a subject is negotiable, and the School Board's right to impose a last offer under SDCL 3–18–8.2 does not convert a non-negotiable subject into a mandatory subject of negotiation.

[¶ 20.] Consequently, we agree with the courts previously cited and hold that the determination of the school calendar through collective bargaining substantially interferes with an inherent management prerogative that pertains to the determination of the government's educational policy. Our conclusion is supported by the fact that, as we previously noted, the school calendar not only affects teachers, but also other school employees, students, parents, taxpayers, other school districts and cooperatives providing joint activities and programs, and in some instances, the entire community. This holding is also supported by the fact that the Legislature has explicitly required school boards to set policy in this area by determining most aspects of the calendar, including: the number of days in a school term, the length of the school day, the number of school days in a week, the date school will begin,[13] whether the school will run year round, when teacher conferences are held, the appropriate time devoted to staff development, and whether the school will hold a summer term.[14] These determinations all go to the "objectives and goals of the particular institution." *University Education Association,* 353 N.W.2d at 542.

[¶ 21.] To rule differently would ignore the Legislature's delegation of this policy making decision in SDCL ch 13–26. It would also create constant negotiation on issues of public interest that the Legislature has left to the discretion of the elected officials who are responsible for policy establishment in the public schools. As both the Maryland and Alaska Supreme Courts noted:

> If teachers' unions are permitted to bargain on matters of educational policy, it is conceivable that through successive contracts the autonomy of the school boards could be severely eroded, and the effective control of educational policy shifted from the school boards to the teachers' union. Such a result could threaten the ability of elective government officials and appointive officers subject to their authority, in this case the school boards and administrators, to perform their functions in the broad public interest.

---

**12.** In *Rapid City* we held that the sensitive subject of classifying students according to their abilities [for purposes of teacher pay] ... is a matter entrusted solely to the discretion of a school board acting through its appointed administrative officials. 376 N.W.2d at 565. In *Webster,* we held that the decision to reduce staff is a managerial decision for the school board, and thus, is not mandatorily negotiable. *Webster,* 2001 SD 94, ¶ 11, 631 N.W.2d at 206.

**13.** This date may be subject to a voter referral procedure set forth in SDCL 13–26–9 to 17.

**14.** See SDCL 13–26–1 and 2 at note 8, *supra.*

*Kenai,* 572 P.2d at 419; *Montgomery County Education Association,* 534 A.2d at 987. Moreover, it must be remembered that the broad public interest is not always the same as the teacher's interests. As the Alaska Supreme Court also noted: "what is in the best interest of the students and the community is not always in the best interests of teachers." *Kenai,* 572 P.2d at 419 n. 7 (citing Rund, Symposium on Teacher Bargaining: Commentary, 50 IndLJ, 344, 350 (1975)). Therefore, as the New Jersey Supreme Court observed:

> [Such m]atters of public policy are properly decided, not by negotiation and arbitration, but by the political process. This involves the panoply of democratic institutions and practices, including public debate, lobbying, voting, legislation and administration .... the very foundation of representative democracy would be endangered if decisions on significant matters of governmental policy were left to the process of collective negotiations ... Our democratic system demands that governmental bodies retain their accountability to the citizenry.

*IFPTE,* 443 A.2d at 191 (further citations omitted). This is the overriding consideration of *Rapid City,* 376 N.W.2d at 564. It requires that the government's educational policy, as it relates to the time a school should best provide its education service, be determined in a democratic political process that is open to all interested parties, rather than in a collective bargaining process with only one group of employees.

[¶ 22.] We reverse.

[¶ 23.] GILBERTSON, Chief Justice, SABERS and KONENKAMP, Justices, and AMUNDSON, Retired Justice, concur.

[¶ 24.] MEIERHENRY, Justice, not having been a member of the Court, at the time this action was submitted to the Court, did not participate.