**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4464-18T4

GLOUCESTER CITY BOARD
OF EDUCATION,

     Plaintiff-Appellant,

v.

GLOUCESTER CITY
EDUCATION ASSOCIATION,

     Defendant-Respondent.

_____

Argued January 6, 2020 – Decided February 7, 2020

Before Judges Sabatino, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Camden County, Docket No. C-000005-19.

Emily Elizabeth Strawbridge argued the cause for appellant (Parker McCay, PA, attorneys; Emily Elizabeth Strawbridge, on the briefs).

Hop T. Wechsler argued the cause for respondent (Selikoff & Cohen, PA, attorneys; Keith Waldman, of counsel and on the brief; Hop T. Wechsler, on the brief).

PER CURIAM

Plaintiff Gloucester City Board of Education (the Board) appeals from a March 25, 2019 Chancery Division order compelling binding arbitration of a grievance filed by defendant Gloucester City Education Association (the Union) on behalf of its members concerning an attendance policy unilaterally adopted by the Board. For the following reasons, we dismiss the appeal, refer the matter to the Public Employment Relations Commission (PERC) for a scope of negotiations determination, and stay the March 25, 2019 order pending PERC's determination.

The Union is the exclusive bargaining agent for the teachers employed by the Board, which operates a K-12 public school district in Gloucester City. The parties entered into a collective negotiations agreement (CNA) covering the period from July 1, 2016 to June 30, 2019.

Article 10 of the CNA states that the length of the school year is 186.5 days, comprised of 181 student contact days, two in-service days, three professional development days, and one day following the last student day. In addition, teachers are required to attend up to five evening meetings per year for parent conferences, back to school events, PTA events, college and science fairs, and "moving up" ceremonies.

A-4464-18T4

Article 9 of the CNA governs temporary leaves of absence. As to sick leave, it provides: "All employees shall receive fifteen (15) sick leave days per year. Ten[-]month employees hired after September 1, 1995 will receive ten (10) sick leave days per year." Teachers are ten-month employees. Unused sick leave days accumulate without limitation. Teachers also receive three personal days per year and five compassionate leave days per year in the event of the death of a member of the teacher's immediate family. The Board or its designee may also grant other leaves of absence with or without pay for good reason.

Article 4 sets forth the four-step grievance procedure for resolution of complaints filed by employees or the Union that allege "a violation, misinterpretation or inequitable application of any of the provisions" of the CNA. Grievances are heard and decided at Level One by a principal, at Level Two by the Superintendent, at Level Three by the Board, and at Level Four by arbitration. Matters that proceed to arbitration are heard by an arbitrator "selected from a panel of arbitrators provided by [PERC] in accordance with the rules required by PERC."

At issue in this matter is whether the grievance involves a matter relating to "the terms and conditions of employment." In that regard, subsection (b) of paragraph 6 of Article 4 provides:

Only matters relating to employees' terms and conditions of employment as set forth in this Agreement may be submitted to arbitration. The arbitrator shall be limited to the issue(s) submitted and shall consider nothing else. The arbitrator can add nothing to, subtract anything from, nor modify the express terms of this Agreement. The arbitrator's recommendations shall be submitted in writing to the Board and the [Union], and shall be advisory except in those disciplinary matters covered by [N.J.S.A. 34:13A-19] in which case arbitration shall be binding.

On June 12, 2018, the Board adopted District Policy 3212-Attendance (the Attendance Policy)—an attendance policy for teaching staff members.[1] The Attendance Policy states:

The regular and prompt attendance of teaching staff members is an essential element in the efficient operation of the school district and the effective conduct of the educational program. Staff member absenteeism exacts a high cost in the depletion of district resources and in the disruption of the educational program, the Board of Education is vitally interested in the attendance of each employee and considers conscientious attendance an important criterion of satisfactory job performance.

The privilege of district employment imposes on each teaching staff member the responsibility to be on the job on time every scheduled working day. This responsibility requires that the employee maintain good health standards, take intelligent precautions against accidents, both on and off the job, and manage his/her

---

[1] The Attendance Policy was initially adopted on August 14, 2013; it was revised on April 21, 2015 and June 12, 2018.

personal affairs to avoid conflict with district responsibilities.

A teaching staff member who fails to give prompt notice of an absence, misuses sick leave, fails to verify an absence in accordance with Board policy, falsifies the reason for an absence, is absent without authorization, is repeatedly tardy, or accumulates an excessive number of absences may be subject to appropriate consequences, which may include the withholding of a salary increment, dismissal, and/or certification of tenure charges.

In accordance with N.J.S.A. 18A:30-1, sick leave is defined to mean the absence from work because of a personal disability due to injury or illness or because the staff member has been excluded from school by the school medical authorities on account of contagious disease or of being quarantined for such a disease in the staff member's immediate household. No teaching staff member will be discouraged from the prudent, necessary use of sick leave and any other leave provided for in the collective bargaining agreement negotiated with the member's majority representative, in an individual employment contract, or provided in the policies of the Board. In accordance with N.J.S.A. 18A:30-4, the Superintendent or Board of Education may require a physician's certificate to be filed with the Secretary of the Board in order to obtain sick leave.

Whenever the rate of absence and or tardiness in any school year is equal to or higher than [3.5%], the Superintendent or designee/s shall develop and present to the Board a plan for the review and improvement of staff attendance. Whenever the rate of absence and or tardiness in any school year of an individual staff member is equal to or higher than [3.5%], the building principal or designee/s shall develop a corrective action

A-4464-18T4

plan for the staff member to review and improve his/her attendance.  The corrective action plan may include but not be limited to a fitness for duty evaluation, scheduled meetings with administration to review attendance, and an examination performed by the district's physician or consultation between the district's physician and staff member's physician.  Each staff member's annual evaluation will contain his/her absentee and tardiness rate for that school year.  The review and improvement plan shall require the collection and analysis of attendance data, tardiness data, the training of teaching staff member in their attendance/tardiness responsibilities, and the counseling of teaching staff members for whom regular and prompt attendance/tardiness is a problem.

[(Emphasis added).]

Notably, 3.5% of the 186.5-day school year is only 6.52 days, considerably less than the ten sick leave days per school year allotted by the CNA.[2]  Moreover, the Attendance Policy does not consider whether the sick leave was patterned or taken for legitimate medical reasons.  Nor does it consider the teaching staff member's prior sick leave usage and accumulated unused sick leave.

On June 13, 2018, the Union filed a grievance asserting that

the mechanical application of [the Attendance Policy], without considering the reasons for absences, is

---

[2] During oral argument before this court, counsel indicated that teachers receive thirteen to eighteen sick leave days per year, depending on date of hire.  We do not find such language in the CNA.

improper.  Furthermore, the [Union] finds this action to be arbitrary and capricious due to the fact that the administration is considering only the total number of absences (and applying them to a formula of their own design) and not the reasons behind such absences.  Any policy that does this violates our members' rights to take sick leave, personal days, bereavement days, jury duty days and use days from the sick bank, as needed.  [Union] members are guaranteed [thirteen] or [eighteen] days per year, depending on the date of hire, plus accumulated sick days and should not be penalized for taking the time off guaranteed to them by the [CNA].

The Union contended that all attendance goals should be stricken from Professional Development Plans.  The grievance did not assert that any members had been subjected to counseling, a corrective action plan, or other form of disciplinary action for not meeting attendance goals.[3]

The grievance advanced to, and was denied at, Level Three of the grievance procedure.  At the Union's request, the matter was then submitted to arbitration under Level Four.  The Board responded by filing this action in the

---

[3] The grievance was filed the day after the Attendance Policy was adopted.  As of February 13, 2019, no staff member had been subjected to a corrective action plan, increment withholding, suspension, or tenure charges for violating the Attendance Policy.  The Union avers, however, that "particular employees have been affected by the challenged policy, as an attendance goal that relies on the [p]olicy was incorporated into certain staff members' [professional development plans]."

A-4464-18T4

Chancery Division, seeking in part to restrain, and permanently enjoin, arbitration of the grievance. The Board asserted:

> Because the parties never agreed to submit criteria for employee evaluations to arbitration, and since the CNA does not contain any language subjecting such to arbitration, it remains the Board's managerial prerogative to determine criteria for employee evaluations, such is not subject to arbitration. Furthermore, the use of the [McREL] teacher evaluation rubric, which contains an attendance component, has been approved by the Commissioner [of Education], and therefore is not subject to collective negotiations.

The Union moved to dismiss the complaint with prejudice. The Union acknowledged that the Board's adoption of the McREL teacher evaluation rubric was not statutorily negotiable because it had been approved by the Commissioner of Education. The Union contended nevertheless that application and impact of the Attendance Policy was both statutorily negotiable and contractually arbitrable, because teachers who do not meet attendance expectations are required to be counseled and thereby disciplined without the exercise of discretion.

Following oral argument, the court issued an order and letter opinion denying the Board's request to restrain arbitration. The court found "the Board's application and use of employment attendance as one of its evaluation criteria

8

is a mandatorily negotiable term or condition of employment," rather than a "non-negotiable managerial prerogative," and "therefore is subject to arbitration." The court noted that application of the Attendance Policy "exclude[s] from consideration the reason for a teacher's absence" and requires "implementation of a Professional Development Plan if expectations are not met." The court concluded that because the Attendance Policy, which requires counseling if a teacher does not meet attendance expectations, "is a mechanical application," it is a "term or condition" under the CNA that is subject to arbitration. In reaching that conclusion, the court explained

> The employment evaluation criteria does not include on its face how the attendance policy is applied, and the application of the policy is in fact a mechanical application, in that teachers who do not meet attendance expectations are required to be counseled. Therefore, the application of the attendance policy goes beyond that which is simply stated in the McREL Rubric and is a "term or condition" under the CNA. As such, the grievance relating to the attendance policy is subject to arbitration.

The Board moved for reconsideration, claiming the court misapplied PERC precedent. The court disagreed and denied the motion in a brief oral decision. This appeal followed.

The Board raises the following points on appeal:

POINT I

NEW JERSEY CASE LAW CONCERNING ATTENDANCE POLICIES AND TERMS AND CONDITIONS OF EMPLOYMENT HAVE BEEN MISAPPLIED BY THE TRIAL COURT.

> A. A mechanical application of a policy on its face does not necessarily impact terms and conditions of employment.

> B. The policy does not provide for a mechanical application of disciplinary action or any other action that impacts terms and conditions of employment.

POINT II

THERE ARE NO INDIVIDUAL TEACHING STAFF MEMBER GRIEVANCES TO CONSIDER.

Our review is guided by well-established legal principals. Public employees have the right to engage in collective negotiations. Council of N.J. State Coll. Locals v. State Bd. of Higher Educ., 91 N.J. 18, 25-26 (1982) (citing N.J. Const. art. I, ¶ 19; N.J.S.A. 34:13A-5.3)). "[T]he majority representative and designated representatives of the public employer shall meet at reasonable times and negotiate . . . other terms and conditions of employment." N.J.S.A. 34:13A-5.3. "However, 'the scope of negotiations in the public sector is more limited than in the private sector' due to the government's 'special responsibilities to the public' to 'make and implement public policy.'" In re Cty.

of Atl., 445 N.J. Super. 1, 21 (App. Div. 2016), aff'd on other grounds, 230 N.J. 237 (2017) (quoting In re IFPTE Local 195 v. State, 88 N.J. 393, 401-02 (1982) (footnotes omitted)).

PERC is charged with administering the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 to -39, and has "primary jurisdiction" to determine "whether the subject matter of a particular dispute is within the scope of collective negotiations." Cty. of Atl., 445 N.J. Super. at 20 (quoting Ridgefield Park Educ. Ass'n v. Ridgefield Park Bd. of Educ., 78 N.J. 144, 154 (1978) (citing N.J.S.A. 34:13A-5.4(d)). "[T]here are but two categories of subjects in public employment negotiation — mandatorily negotiable terms and conditions of employment and non-negotiable matters of governmental policy." Ridgefield Park, 78 N.J. at 162. We give appropriate deference to PERC's expertise in public sector employer-employee relations. In re Hunterdon Cty. Bd. of Chosen Freeholders, 116 N.J. 322, 328 (1989).

CNAs are contracts; "contract interpretation is a question for judicial resolution." Ridgefield Park, 78 N.J. at 155. "When . . . there are no material factual disputes, 'the interpretation of a contract is subject to de novo review by an appellate court.'" Cty. of Atl., 230 N.J. at 255 (quoting Kieffer v. Best Buy, 205 N.J. 213, 222-23 (2011)).

Thus, PERC and the courts serve two distinct functions: PERC makes the threshold determination whether the disputed issue is a matter the parties can legally negotiate and enforce through arbitration while the court determines whether the CNA involves a matter the parties agreed to arbitrate. Ridgefield Park, 78 N.J. at 154-55. As the Ridgefield Park Court explained:

> where a party resists an attempt to have a dispute arbitrated, it may go to the Superior Court for a ruling on the issue of its contractual obligation to arbitrate. However, the issue of contractual arbitrability may not be reached if the threshold issue of whether the subject matter of the grievance is within the scope of collective negotiations is contested. In that event, a ruling on that issue must be obtained from PERC.
>
> [Id. at 155.]

Therefore, in some cases, "it may be necessary to go to both PERC and the Superior Court in order to completely resolve a disagreement concerning the arbitrability of a particular dispute." Id. at 153.

Here, the grievance challenged the "mechanical application" of the Attendance Policy that subjects teaching staff members to corrective action plans or other disciplinary action if their absences equal or exceed 3.5% of workdays, without considering the reasons for the absences. The Board did not file a scope of negotiations petition with PERC. Instead, it filed this action in the Superior Court. In its complaint, the Board alleged "[t]he criteria for

12

evaluation of teachers" is "a matter of 'inherent managerial prerogative,'" rather than "a term and condition of employment," and is therefore "nonnegotiable." Moreover, the Board argued that because the Commissioner of Education approved the McREL teacher evaluation rubric, which includes attendance, it is not subject to collective negotiations, citing N.J.S.A. 18A:6-125.[4]

The trial court found "the Board's application and use of employment attendance as one of its evaluation criteria is a mandatorily negotiable term or condition of employment," rather than a "non-negotiable managerial prerogative," and "therefore is subject to arbitration." However, "[w]here the trial judge determines that the real controversy is not one of contractual arbitrability, but rather concerns the propriety of the parties negotiating and agreeing on the item in dispute, he should refrain from passing on the merits of that issue." Ridgefield Park, 78 N.J. at 153-54. Here, the CNA contains, but does not define, the phrase "terms and conditions of employment." Thus, by contesting whether the Attendance Policy is subject to arbitration, the parties are necessarily contesting whether the policy is within the scope of negotiations.

---

[4] N.J.S.A. 18A:6-125 provides that "[a] school district's evaluation rubric approved by the commissioner pursuant to [N.J.S.A. 18A:6-122] shall not be subject to collective negotiations."

Our opinion in <u>Piscataway Township. Education Association v. Piscataway Township Board of Education</u>, 307 N.J. Super. 263 (App. Div. 1998) is instructive. There, the board unilaterally altered the school calendar due to weather-related closings, without submitting the proposed changes to collective negotiations. <u>Id.</u> at 267-68. The union initiated an action challenging the board's failure to negotiate "over changes in the school calendar and over the impact of those changes on [b]oard employees." <u>Id.</u> at 265. A PERC hearing examiner concluded that the board "had a contractual right to reschedule the school days," but no "duty to negotiate over any impact issues." <u>Id.</u> at 269. The union appealed.

We reversed and remanded the case to PERC, finding that while the decision to change the school calendar was not negotiable, the impact of that decision may be negotiable. <u>Id.</u> at 270, 276. In reaching that conclusion, we addressed the "impact" issue under the scope of negotiations test. <u>Id.</u> at 271-275. We explained that:

> the mere connection between the exercise of a managerial prerogative and the impact of that exercise on employees does not render the impact issue non-negotiable. In each case, a determination should be made under <u>Board of Education of Woodstown-Pilesgrove Regional School District v. Woodstown–Pilesgrove Regional Education Association</u>, 81 N.J. 582 (1980) whether negotiating the impact issue would significantly or substantially encroach

14

upon the management prerogative. If the answer is yes, the duty to bargain must give way. If the answer is no, bargaining should be ordered.

[Id. at 276.]

Here, as in <u>Piscataway</u>, the parties contested the negotiability of the Attendance Policy's impact before the trial court and this court. The Board argues "that the establishment of an attendance policy is a matter within the discretion given to the Board, and thus can be [done so] absent negotiations." The Union acknowledges "PERC distinguishe[s] . . . between an employer's <u>establishment of a sick leave verification policy</u>, which is neither statutorily negotiable nor contractually arbitrable, and the employer's <u>application of that policy</u>, which is negotiable and thus can be subject to contractual grievance procedures." According to the Union, the mechanical application (i.e., impact) of the Attendance Policy improperly subjects teachers to disciplinary actions. It contends that "[t]he effect of an attendance policy that imposes a [corrective action plan] and counseling on teaching staff members based on the total number of absences without considering the reason for each absence is to presumptively classify certain staff members as sick leave abusers."

Accordingly, because the parties contest whether the Attendance Policy's impact on employees is a "managerial prerogative" or a "term and condition of

A-4464-18T4

employment," the trial court "should have refrained from ruling whether the parties had contractually agreed to arbitrate the dispute until PERC had decided the threshold issue of negotiability." Bd. of Educ. of Bernards Twp. v. Bernards Twp. Educ. Ass'n, 79 N.J. 311, 316 (1979) (citing Ridgefield Park, 78 N.J. at 155).

The Board further argues that the Union is improperly asserting a blanket challenge to the Attendance Policy without naming a member who has been impacted by it. We are unpersuaded by this argument. According to the Union, it appears that certain teaching staff members have now been affected by the challenged policy through incorporation of its attendance goal into their professional development plans. This outcome is hardly surprising considering the mandatory nature of the Attendance Policy, which requires the principal to develop a corrective action plan whenever a teaching staff member's rate of absence or tardiness reaches or exceeds 3.5%. The Attendance Policy also requires each teaching staff member's annual evaluation to include his or her absentee and tardiness rate. This may lead to counseling and subject the member to disciplinary consequences, "which may include the withholding of a salary increment, dismissal, and/or certification of tenure charges." Notably, the Attendance Policy does not consider the member's attendance during prior

school years, the member's accumulated sick leave, the legitimacy of the sick leave utilized, or whether the sick leave usage was patterned.

Given the mandatory nature and as-applied impact of the Attendance Policy, we do not view the grievance as impermissibly hypothetical and conclude that PERC is the appropriate forum to resolve "whether negotiating the impact [of the Attendance Policy] would significantly or substantially encroach upon the management prerogative." Piscataway Twp., 307 N.J. Super. at 276.

For these reasons, we refer this matter to PERC for a scope of negotiations determination and dismiss the appeal without prejudice. Any aggrieved party may file a renewed appeal after PERC issues a determination. The March 25, 2019 order directing arbitration is stayed in the meantime. If PERC determines the issue is negotiable the stay will automatically expire in 30 days, subject to the Board's right to: (1) move to reopen this appeal: (2) appeal PERC's ruling; and (3) move to consolidate the appeals. If PERC determines it is not negotiable, the stay shall remain in force, subject to the Union's right to appellate review of PERC's ruling. We do not retain jurisdiction.

Appeal dismissed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17                                                                    A-4464-18T4